[S. F. No. 18333. In Bank. Aug. 27, 1952.]

JAMES F. THOMAS, Respondent, v. CALIFORNIA EMPLOYMENT STABILIZATION COMMISSION et al., Appellants.

Fred N. Howser and Edmund G. Brown, Attorneys General, Irving H. Perluss, William L. Shaw and Chas. W. Johnson, Deputy Attorneys General, for Appellants California Employment Stabilization Commission et al.

Pillsbury, Madison & Sutro, Marshall P. Madison, Francis N. Marshall and Frederick H. Hawkins for Appellant Pacific Lumber Company.

Todd & Todd, Clarence E. Todd, Henry C. Todd, George E. Flood and Gordon W. Mallatratt for Respondent.

GIBSON, C. J.—Defendants appeal from a judgment which granted a writ of mandate ordering benefits to be paid to plaintiff and 190 other employees of defendant Pacific Lumber Company under the Unemployment Insurance Act. (Stats. 1935, p. 1226, as amended; 2 Deering's Gen. Laws [1937], Act 8780d; 3 Deering's Gen. Laws [1944], Act 8780d.) The judgment set aside a decision of the California Unemployment Insurance Appeals Board which denied such benefits to the claimants.

The logging employees of the company struck and set up a picket line around the company's sawmill. Claimants, who were plant or mill employees, refused to go through the picket line. The company closed the plant and gave claimants notices of "employment termination." The appeals board determined that claimants were out of work because of a trade dispute and therefore were disqualified by section 56 of the act from receiving unemployment benefits.* This proceeding for a writ of mandate was then instituted in the superior court, and the matter was presented on the record before the board. The court, after holding that it was entitled to exercise independent judgment on the evidence, found that claimants had been discharged and concluded, in effect, that this removed their disqualification. It annulled the decision of the board and granted a writ of mandate directing the commission to pay benefits accruing after the date of discharge.

Defendants contend that the trial court was without power to reweigh the evidence and that, in any event, the judgment must be reversed because the undisputed facts show as a matter of law that claimants are disqualified under section 56 of the Unemployment Insurance Act.

---

*Section 56, as amended in 1945 (Stats. 1945, p. 2225), provides: "An individual is not eligible for benefits for unemployment, and no such benefit shall be payable to him under any of the following conditions: (a) If he left his work because of a trade dispute and for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

 The appeals board is a statutory agency with state-wide jurisdiction, and it does not have constitutional authority to make final determinations of fact. (For general statutory provisions see Unemp. Ins. Act, Deering's Gen. Laws [1944], Act 8780d, §§ 1, 77, et seq.) Any person deprived of a property right by such an administrative body is entitled to a limited trial de novo in the superior court. (*Laisne* v. *State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457]; *Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20]; *Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304].) In our opinion the benefits provided for by the Unemployment Insurance Act are property rights within the meaning of the term as used in the cases requiring a trial de novo. When a claimant has met all requirements of the act, and all contingencies have taken place under its terms, he then has a statutory right to a fixed or definitely ascertainable sum of money. (See, for example, §§ 54, 67 [now in 68], and 72 as amended in 1945, Stats. 1945, pp. 1108, 2558, 2559-2560.) The determination of the exact amounts due is essentially a mathematical and mechanical process, and the administrative authorities have no discretion to withhold benefits from any particular claimant once it is determined that the facts support his claim and the condition of the fund permits payment. Benefit claims, accordingly, are not comparable to applications for business and professional licenses such as those considered in *McDonough* v. *Goodcell,* 13 Cal.2d 741, 746-749 [91 P.2d 1035], and *Southern Cal. Jockey Club* v. *California Racing Board,* 36 Cal.2d 167, 174-175 [223 P.2d 1], where we held that a denial of the licenses did not interfere with property rights. There, as the court pointed out, the administrative officers were given broad discretionary powers to deny applications, subject to review only for disregard of the law, arbitrary action, or other abuse of discretion. We conclude, therefore, that in the present case the trial court acted correctly in exercising its independent judgment on the evidence.

 The next question is whether the evidence is sufficient to support the determination of the trial court that the claimants are entitled to receive unemployment insurance benefits. They refused to cross the picket line which was set up by the logging workers on January 14, 1946, and the company closed its plant on January 18 because of the absence of certain unidentified "key men" neces-

sary to the operation of the mill. Some of the claimants participated in the picket line both before and after the plant was closed. It is undisputed that claimants' refusal to cross the picket line resulted in their being out of work because of a trade dispute, within the meaning of section 56 of the act, *supra,* (Stats. 1945, p. 2225), from January 14 to and including January 17, and, therefore, that they were disqualified from receiving benefits for this period. (See *Matson Terminals, Inc.* v. *California Emp. Com.,* 24 Cal.2d 695 [151 P.2d 202], and companion cases.)

After the plant was closed each of the claimants received from the company a notice entitled "employment termination," which was signed by the company's foreman and stated that the "date terminated" was January 18, 1946. The trial court found and concluded that these notices were used by the company for the purpose of discharging claimants, that the company terminated and discharged each claimant on January 18, 1946, and that the discharge was the direct and proximate cause of unemployment after that date.

The evidence is sufficient to support the trial court's finding that claimants were discharged as of January 18. They were employees of the company until that date, since their refusal to cross the picket line did not terminate the employer-employee relationship. (See *Mark Hopkins, Inc.* v. *California Emp. Com.,* 24 Cal.2d 744, 749, 751 [151 P.2d 229, 154 A.L.R. 1081].) The "employment termination" notices were unqualified and indicated that there was a discharge as of the designated date, and there is other evidence, which need not be set forth here, that tends to support the finding. Testimony, relied upon by defendants, that the company did not intend to discharge claimants but only to terminate their "continuous employment period" for purposes of the company's bonus plan merely presented a conflict in the evidence which was resolved in favor of claimants.

A more difficult question is presented as to whether there is any substantial evidence which supports the determination of the trial court that the discharge of claimants by the company was the direct and proximate cause of each claimant being unemployed after January 18, 1946. There appears to be no conflict in the evidence with respect to the events which transpired insofar as this phase of the case is concerned. Claimants refused to pass the picket line which the logging employees established around the company's sawmill, and, as we have seen, it is undisputed that this refusal

operated to disqualify claimants from receiving benefits for the period of their unemployment prior to January 18. The picket line, as well as the trade dispute between the logging employees and the company, continued after that date and during the entire period for which claimants seek benefits. Four of the six claimants who testified in the administrative proceeding admitted that they participated in the picket line after they were discharged.

There is no evidence in the record indicating that the termination notices caused claimants to remain out of work after January 18 or had anything to do with their determination to remain away from their jobs. None of the claimants who appeared as witnesses testified that he would have returned to work if he had not been discharged or that he would have been willing to cross the picket line. To the contrary, claimants did not respond to two notices given by the company to all employees on or about January 21 and February 18 requesting that they return to work immediately or as soon as strike conditions cease to exist.

Under the circumstances presented by the record in this case the only reasonable conclusion is that claimants remained out of work after January 18 as well as before that date because they were unwilling to cross the picket line which was maintained by the logging employees in their trade dispute with the company. Accordingly, claimants were disqualified under section 56 of the act from receiving unemployment insurance benefits.

The judgment is reversed.

Shenk, J., Schauer, J., and Spence, J., concurred.

TRAYNOR, J.—I concur in the judgment.

It is undisputed that claimants left their work because of a trade dispute within the meaning of section 56(a) of the Unemployment Insurance Act. (See *Matson Terminals, Inc.* v. *California Emp. Com.*, 24 Cal.2d 695, 702-704 [151 P.2d 202]; *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321, 328 [109 P.2d 935].) The only question presented, therefore, is whether or not they remained out of work by reason of the fact that the trade dispute was still in active progress in the establishment in which they were employed. For the reasons set forth in the dissenting opinion in *Southern California Jockey Club* v. *California Racing Board,* 36 Cal.2d 167, 178 [223 P.2d 1], and the dissenting

opinions cited therein, it is my opinion that claimants were not entitled to a limited trial de novo on this issue; whether or not the right to unemployment insurance benefits is a property right. Accordingly, the only issue properly before the trial court and now before this court is whether the findings of the appeals board are supported by substantial evidence.

In *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744 [151 P.2d 229, 154 A.L.R. 1081], this court said regarding the tests for determining the duration of the disqualification under section 56(a), when the original unemployment had been superseded by new employment: "A claimant is thus ineligible for benefits if the trade dispute is the direct cause of his continuing out of work. If a claimant who leaves his work because of a trade dispute subsequently obtains a permanent full-time job, however, he is no longer out of work and the continuity of his unemployment is broken. If he loses his new job for reasons unrelated to the dispute, he is unemployed by reason, not of the trade dispute, but of the loss of the new employment [citations]. The trade dispute that caused him to leave his original employment is not the cause of his subsequent unemployment, and he would no more be disqualified from receiving benefits for such unemployment than if he had not been previously employed in the struck establishment.

"The termination of a claimant's disqualification by subsequent employment thus depends on whether it breaks the continuity of the claimant's unemployment and the causal connection between his unemployment and the trade dispute."

In the present case the appeals board was of the opinion that an unequivocal discharge would also break the causal connection between the unemployment and the trade dispute. It found, however, that by issuing the employment termination notices the employer did not unequivocally terminate the employment relationship.

There is evidence that the employer customarily used the employment termination notices not only when an employee resigned or was discharged, but for the purpose of terminating an employee's continuous service record under the "Continuous Service Compensation Plan" when he was absent without leave for more than three days. Accordingly, the purpose for which the notices were used in the present case cannot be determined from their provisions alone.

During the period the employer issued the termination notices it also sent to all employees and former employees the following notice:

"All Employees and former Employees not working because of the strike or strike conditions are requested and urged to return to work immediately or as soon as such conditions cease to exist.

"Failure to comply with this request may result in other persons being employed in your place."

It may reasonably be inferred that the employer was not discharging employees it was urging to return to work, and that the termination notices were therefore neither intended to sever nor understood by claimants as severing the employer-employee relationship. Moreover, the notice urging the employees to return to work itself indicated that they would retain their status until other persons were employed in their place.

Since the determination of the appeals board was supported by substantial evidence, I concur in the reversal of the judgment.

Edmonds, J., concurred.

CARTER, J.—I dissent.

The evidence supports the trial court's conclusion that the claimants were out of work because of a discharge by the employer rather than a trade dispute.

After January 17, 1946, is the crucial period, for the employer closed the plant. After the plant was closed each of the claimants received from the company a notice which was in form as follows:

"THE PACIFIC LUMBER COMPANY FORM 2105
EMPLOYMENT TERMINATION

The employee must present this slip to the Employment Office at Scotia within two days from date of issue.

Employee_____ No._____ B_____

Working_____ Occupation_____

Rate_____ Date Last Worked_____ No. hours_____

Date Terminated_____

Signed_____ Noted_____
 Foreman Timekeeper

Employee's Signature_____"

The forms, signed by the company's foreman, were appropriately filled out with respect to each claimant, the "date terminated" being stated as January 18, 1946. The trial court found and concluded that the claimants were given the termination notices because they refused to go through the picket line; that the notices were used in this case for the purpose of terminating claimants' employment and amounted to an unequivocal discharge; and that this discharge interposed a new intervening cause for claimants' unemployment, relieving them after January 18, 1946, from any disqualification imposed by section 56 of the Unemployment Insurance Act.

It is conceded that the evidence is sufficient to support the trial court's finding that claimants were unequivocally discharged as of January 18th, and that they were employees of the company until that date, since their refusal to cross the picket line did not terminate the employer-employee relationship. (See *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744, 749, 751 [151 P.2d 229, 154 A.L.R. 1081].) This is clear for the "employment termination" notices were unqualified and plainly indicated that there was a discharge as of the designated date. One claimant who refused to cross the picket line was told by his immediate supervisor that he was "through," that after the strike was over he would have no job, and that the supervisor would see to it that the claimant would not receive "compensation." Claimants were given their 1946 federal withholding tax statements, which, under the Internal Revenue Code, need not have been furnished until termination of employment or until January 31st of the succeeding year. (26 U.S.C.A. § 1625[a].) Defendants rely on testimony that the company did not intend to discharge claimants but only to terminate their "continuous employment period" for purposes of the company's bonus plan. As the court found, however, no such limited purpose was indicated on any of the notices, and the testimony merely presented a conflict in the evidence which was resolved in favor of claimants.

The majority opinion holds, however, that the discharge was not the proximate cause of the unemployment after January 18th, contrary to the trial court's finding. With that I disagree. The record supports the determination of the trial court that the discharge of claimants on January

18, 1946, interposed a new, intervening cause for their unemployment. The fact that claimants were unemployed because of a trade dispute from January 14th through January 17th did not preclude them from becoming entitled to benefits after that date if continuation of their unemployment was due to factors other than their participation in the trade dispute. The disqualification exists only during the period in which the dispute remains the cause of the unemployment. (Section 56 of the act; see *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744, 748-750 [151 P.2d 229, 154 A.L.R. 1081].)

The company's act of discharging claimants completely changed the nature of their unemployment, insofar as their status under section 56 is concerned. Disqualification under this statute depends upon the fact of voluntary action by the worker. (See *Matson Terminals, Inc.* v. *California Emp. Com.*, 24 Cal.2d 695, 702-704 [151 P.2d 202]; *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321, 327-328 [109 P.2d 935]; see, also, *McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239, 242-245, 252 [209 P.2d 602].) An employee who observes a picket line is disqualified on the theory that he has a free "choice" in determining whether to work in a plant in which certain of his fellow employees are on strike, and that his decision not to work is voluntary. (*Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321, 327-328 [109 P.2d 935]; *Matson Terminals Inc.* v. *California Emp. Com.*, 24 Cal.2d 695, 702-704 [151 P.2d 202].) He nevertheless remains an employee, regardless of the strike and picketing (see *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744, 749, 751 [151 P.2d 229, 154 A.L.R. 1081]), and he can return to work at any time he becomes willing to do so. Where, as here, however, the employer discharges some of its employees, such persons no longer have the choice of returning to their jobs, and it cannot be said that their subsequent unemployment is due to their voluntarily continuing out of work because of a picket line. Unlike persons who remain employees, they have no reasonable expectation of going back to work upon termination of the trade dispute, and if they do obtain work with the same employer, they will have to be rehired and will come in as new employees. It thus seems apparent that section 56 ceases to operate with respect to workers whose employment relationship has been wholly severed, and it can have no bearing on

their right to benefits until they are reemployed, upon mutual agreement.

Defendants contend that two notices given by the company show that claimants voluntarily remained away from their jobs because of the trade dispute. One notice, dated January 21, 1946, requested "all Employees and former Employees not working because of the strike" to return to work immediately or as soon as strike conditions ceased to exist. stated that "you are still employees of the Company" and repeated the request to return to work. These requests, how-The second notice, given about a month after the discharge, ever, did not alter the fact that claimants were discharged nor did they serve to restore the employment relationship, and, as we have seen, if anyone had returned to work in response to the requests, he would have done so as a new employee.

Unlike the situation presented in *McKinley* v. *California . Emp. Com.*, 34 Cal.2d 239 [209 P.2d 602], relied upon by defendants, the record does not establish that claimants engaged in any conduct which they knew would cause the company to retaliate by preventing their return to work. The court impliedly found, and the finding is based upon substantial evidence, that claimants did not know that refusal to cross the picket line would result in their discharge. Such conduct ordinarily suspends but does not terminate the employment relationship, and the company gave no warning that claimants would be discharged. The company had adopted a rule which provided that an employee who was absent for over three days without permission "shall be dropped from the Company's payroll and employment period terminated," but the rule was contained in a printed booklet entitled "Continuous Service Compensation Plan" and may reasonably be interpreted as pertaining only to that plan.

Further, it does not appear that claimants' conduct caused the plant to be closed on January 18, 1946, or to remain closed thereafter. The record supports the finding that the plant was closed by the absence of certain key men necessary to the operation of said mill, but does not establish that claimants were the key men. Even if we assume that the strike caused the absence of the key men, claimants were not members of the same local union to which the strikers belonged, and there is nothing to show that claimants voted

for or authorized the strike or that the key men were absent because some of the claimants participated in the picketing.

I would, therefore, affirm the judgment.

Respondent's petition for a rehearing was denied September 25, 1952. Carter, J., was of the opinion that the petition should be granted.