[Civ. No. 15323.   First Dist., Div. One.   June 15, 1953.]

JOHN SAVAGE, Appellant, v. ELLIS D. SOX et al., Respondents.

Joseph T. Curley and Marvin C. Hix for Appellant.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Respondents.

BRAY, J.—Appeal from a judgment denying plaintiff's application for a peremptory writ of mandate to compel the San Francisco Civil Service Commission to reinstate plaintiff after being removed by it from his position.

### QUESTIONS PRESENTED

1. Insufficiency of the evidence.
2. Alleged unfairness in the trial.
3. Was plaintiff entitled to a court trial de novo?

### FACTS

This case comes up on a settled statement. Plaintiff for 18 years was a civil service employee of San Francisco and was in the permanent position of steam engineer in the San

Francisco Hospital. A valve in the steam line at the hospital burst, causing considerable damage. Thereafter, pursuant to charter provisions, charges against plaintiff were brought and heard before Dr. J. C. Geiger, then director of public health. No question is raised as to the regularity of those proceedings. The charges were as follows:

"1. Inattention to duties in that you failed to comply with instructions of the Chief Operating Engineer on November 22, 1950.

"2. Incompetence in that your action in not following instructions in opening the main steam valve on the boiler header caused the turbine stop valve to be blown off resulting in considerable damage to the hospital property."

It will be observed that while there are two specifications in the charges, they both resolve themselves into the one charge of failing to follow the chief engineer's instructions. Thierbach, the chief engineer, testified that on the day in question, around 9 a. m. he gave plaintiff orders to open up the main valve on the turbine steam line. At the same time he warned plaintiff to be careful about draining the line properly; that there was a possibility that it was full of water and he should "take all the time he needed to warm it up," and to see to it that the line was drained before he opened the valve. It is necessary to open the line slowly, for if there is water in the line, the condensation of steam by turning on the water "might form a slug . . . and there might be a weakness in the valves, and the steam in back of the water cause an explosion when it hit the valve, not an explosion, like a hydraulic ram, the impact." Even without water in the line, a too rapid opening of the valve would cause water to form with the same result. Thus, whether or not there was water in the line the valve must still be opened slowly. Thierbach then left. When notified that the valve had blown he immediately returned and saw what had taken place. If plaintiff had seen to it that the line was drained before he opened the valve there would have been no trouble. Dr. Geiger then asked him: "Your instructions were not carried out? Mr. THIERBACH: Completely disobeyed." On cross-examination Thierbach was asked: "You are assuming he disobeyed orders because the valve cracked? MR. THIERBACH: From the evidence shown, I could see what happened." There were two drain valves but Thierbach did not know whether they were open at the time he gave

the instructions. They were open when he returned. (Plaintiff testified and the evidence shows that they were open at all times.)

Engineer Hughes testified that he heard Thierbach tell plaintiff "to be careful . . . see all lines were drained before opening the big valve, and take it easy." Hughes then went down to the engine room. Plaintiff came down the ladder from the boiler room (where the steam line was) and spoke to him and then the valve burst. This was 9:15 or around that time. Thierbach gave the order around 9:10 or 9:05. There could not have been more than five or ten minutes between the giving of the order and the explosion. The valve had been on the line about 12 years. Plaintiff had it off, repacked it and put in a new gasket the day before.

Two charts were introduced, one showing that the valve blew about 9:20, the other about 9:30. There was evidence that the charts were not always accurate.

Plaintiff testified that he had overhauled the valve the previous day. On the morning in question he noticed a little water dripping from the flanges. Both drains were open. Plaintiff had been opening valves for 18 years—knew how to do it. He always did it slowly. Thierbach told him to open the valve. Plaintiff in the presence of Hughes told Thierbach there was too much water in the line and asked if he could shut the valve on the hot side. Thierbach told him to leave it open. It was standard practice as well as that of plaintiff to first open the valve half a turn, then fully open it, taking from two to five minutes in the operation. This time plaintiff opened it half a turn, then in about half a minute, another half turn, then in about three-quarters of a minute, three-quarters or maybe a turn. This took probably five minutes. Then about 20 minutes later he opened the valve full open. Plaintiff then went down to Hughes and stated that he did not like the line, the traps were not working right, and complained that someone had cut the by-passes on the traps. Plaintiff stated this was bad practice. Hughes said they were not needed. It was then the valve blew. Plaintiff followed Thierbach's instructions. The valve had been on the line 10 or 15 years. Had plaintiff opened the valve quickly there would have been water hammer. There was none. The explosion took place 10 to 15 minutes after he opened the valve. With both drains open the cold side could not drain very well and that was why he wanted to close the hot side drain but Thierbach would

not let him. Thierbach and Hughes denied that plaintiff had said anything about wanting to close the hot side drain or that Thierbach had told plaintiff to leave it open.

Junior Operating Engineer Thorne testified plaintiff told him he was going to open the valve. The explosion took place 20 or 25 minutes thereafter. He noticed plaintiff pointing out the drains to Thierbach but did not hear the conversation.

One Fitch, an engineer apparently called by plaintiff, testified that the hot side drains should be closed as otherwise the cold side would not drain very well. The accident could have happened without any water in the line at all. The accident conceivably could happen without anyone being to blame. Perhaps the putting in of the gasket the day before might have put a strain on the valve that was not there before. Something always happens when steam is turned into a cold line.

Plaintiff's record was introduced showing that on one occasion in 1937 he had disregarded instructions; on one occasion in 1948, he was inattentive to duties and had failed to cooperate with the surgical personnel; and in 1949 he was suspended for 10 days for failure to follow the instructions of the chief engineer and was warned that he would be discharged if another incident occurred.

Based on this evidence Dr. Geiger found plaintiff guilty of the charges preferred and ordered him dismissed from the service of the department of health. On appeal to the civil service commission it sustained the dismissal and later denied a petition for reconsideration. Thereafter plaintiff filed a petition for a writ of mandate in the superior court. On the hearing of the alternative writ plaintiff offered the testimony of one Hancock to prove that he had opened the drain valves just before plaintiff came on duty and offered himself as a witness to prove the cause of the explosion. The court refused to admit the offered evidence on the ground that it was not offered at the Geiger hearing. Plaintiff testified as to his earnings subsequent to his dismissal. Defendants then offered a transcript of the Geiger proceedings. It was admitted in evidence. The court then found that there was substantial evidence to support Dr. Geiger's determination that the explosion was due to plaintiff's failure to follow his superior's orders and denied a peremptory writ.

1. *Was the Evidence Insufficient?*

■ It is well settled that in a review of the decision of the superior court upholding the determination of a local

administrative agency, "the power of the appellate court begins and ends with the inquiry whether there is any substantial evidence, contradicted or uncontradicted, which in and of itself will support the conclusion reached by the superior court." (*Corcoran* v. *San Francisco etc. Retirement System,* 114 Cal.App.2d 738 [251 P.2d 59].) The only issue before Dr. Geiger was whether plaintiff disobeyed Thierbach's instructions to open the valve slowly. In view of plaintiff's interest and particularly of the conflict between him and Hughes and Thierbach, which conflict Dr. Geiger obviously decided against him, Dr. Geiger had the legal right to disregard his entire testimony as to what he did. This leaves the evidence as follows: Hughes testified that only 10 minutes at most elapsed from the time Thierbach instructed plaintiff to open the valve and the explosion. While Thierbach was not examined as to what length of time it takes to open a valve "slowly," his testimony as an expert was that based on the time shown by the chart, "From the evidence shown, I could see what happened," plaintiff had disobeyed his instructions to be careful to see that the line was drained before he opened the valve, and had he properly drained the line the explosion would not have occurred. In a sense, the opinion of plaintiff's superior as to what happened in his absence seems to be rather small evidence upon which to discharge an employee after 18 years' service. ■ However, we cannot say that the opinion of an expert to the effect that had the line been properly drained and the valve opened slowly the explosion would not have occurred, and based on the time taken to open the valve as shown by the evidence, he could tell that plaintiff did not properly drain the line, is not substantial evidence. Moreover, Hughes testified that the explosion occurred "Right when Mr. Savage came off the boiler from opening the valve," while plaintiff contends that the explosion did not take place until 10 to 15 minutes after he opened the valve. Another matter which Dr. Geiger was entitled to consider on the question of whether plaintiff obeyed instructions was this: Plaintiff's expert Fitch testified that the hot valve should be turned off to permit the line to drain properly. Plaintiff testified also that he felt that it should have been done but that Thierbach instructed him not to do it. Dr. Geiger found, in effect, based on Thierbach's and Hughes' testimony, that Thierbach did not so instruct. Thus plaintiff practically admits that he did not

properly drain the line and thereby disobeyed instructions so to do.

### 2. *Alleged Unfairness.*

■ Plaintiff claims that Dr. Geiger exhibited an unfair attitude towards him. The record does not support this contention. While in one or two instances Dr. Geiger was more abrupt than the circumstances warranted, plaintiff was not prevented from getting in all the evidence he offered, nor did such abruptness injure plaintiff. On one occasion Dr. Geiger referred to interruptions by both plaintiff's counsel and the personnel officer as "acrimonious debates" and on another Dr. Geiger told plaintiff not to teach him physics, when plaintiff was explaining the change of water into steam and its effect. The hearing was conducted by a layman and in a layman's manner, asking for conclusions. However, in each instance the witness gave answers setting forth the facts. No objection was made to the form of the questions nor was cross-examination ultimately curtailed.

### 3. *Limited Trial de Novo.*

Plaintiff contends that the well established rule set forth in *La Prade* v. *Department of Water & Power,* 27 Cal.2d 47 [162 P.2d 13] , *Corcoran* v. *San Francisco etc. Retirement System, supra,* 114 Cal.App.2d 738, and in other cases, to the effect that in a review of the action of a local administrative board or officer exercising quasi-judicial powers there is no trial de novo, is no longer in effect because of the amendment in 1950 to section 1, article VI, of the Constitution. It is contended that this rule is based upon the determination that such boards and officers were in the nature of quasi-inferior courts permitted by the then language of section 1 to the effect that the judicial power of the state shall be vested in ". . . such inferior courts as the Legislature may establish in any incorporated city or town, township, county or city and county." The 1950 amendment struck from the section the above language and substituted "municipal courts, and justice courts." Article XI, section 8½, provides that in a city and county when the municipal court is established "there shall be no other court inferior to the superior court . . ." There is a somewhat similar provision in section 11, article VI, as amended in 1950. Thus, there can be no courts below the superior courts other than the two last mentioned. Therefore, says plaintiff, no longer do local administrative boards and officers have quasi-inferior court

486

status and a review of their proceedings requires a limited trial de novo as in the case of statewide administrative boards and officers.* To give local boards and officers quasi-judicial powers would, says plaintiff, violate article XI, section 8, of the Constitution requiring charters to be consistent with and subject to the provisions of the Constitution. The giving of such powers would be inconsistent with article III which separates the departments of government of the State of California and provides that no person charged with the exercise of functions appertaining to one department shall exercise functions appertaining to either of the others, unless expressly directed or permitted by the Constitution. Further, says plaintiff, the giving of such powers would be inconsistent with the constitutional provisions heretofore mentioned prohibiting courts below the justice courts. As early as 1868 in *People* v. *Provines,* 34 Cal. 520, it was pointed out that this article applies to the powers of the *state* government, not the local governments to be created by the Legislature. The court referred to the reason and policy which dictated this article III. In England where the powers of government were divided into but two departments—King and Parliament—the power of the earlier kings to both declare and execute the law led to frequent abuses, with which the framers of American Constitutions were familiar and against which they sought to provide a safeguard by separating the judicial from the executive and legislative powers, so far as it could be done without stripping either of the latter of such judicial powers as are indispensable to the proper and efficient working of their own functions. ''The mischief, however, against which they sought to provide, did not come from inferior or subordinate officers, but from the higher grades, in whose hands the first and leading powers of the Government were vested. So far as the former were concerned, they were sufficiently under the control of the latter. Abuse of power could not come from the former in such measure as to destroy or overthrow the liberties of the people, except by the direction or connivance of the latter. To surround the latter with checks was a sufficient protection against the former. Hence, the framers of American Constitutions were content with checks

*For the rule applicable to them see *Standard Oil Co.* v. *State Board of Equal.,* 6 Cal.2d 557 [59 P.2d 119];*Laisne* v. *State Board of Optometry,* 19 Cal.2d 831 [123 P.2d 457]; *Thomas* v. *California Emp. Stab. Com.,* 39 Cal.2d 501 [247 P.2d 561].

upon the latter, leaving the former, as we consider, to be regulated by the Legislative Department.'' (P. 537.)

''Moreover it is settled that the separation of powers provision of the Constitution does not apply to local governments as distinguished from departments of the state government.'' (*County of Mariposa* v. *Merced Irr. Dist.*, 32 Cal.2d 467, 476 [196 P.2d 920].)

In *Dierssen* v. *Civil Service Comm.*, 43 Cal.App.2d 53, we stated (p. 59 [110 P.2d 513]) : ''The question as to whether by charter provision local boards, such as a civil service commission, may be invested with judicial fact finding powers seems never to have been seriously questioned in this state.'' We pointed out that article VI, section 1, refers to the judicial power of the *state* only, and that local boards and officers are governed by special constitutional provisions, such as the broad provisions of article XI, section 6, of the Constitution dealing with ''The powers of chartered cities. That section, so far as pertinent herein, provides that, 'Cities and towns hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered . . . to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters. . . .' Moreover, article XI, section 8½, subdivision 4, provides that, 'it shall be competent in any charter framed in accordance with the provisions of this section, . . . for any city or consolidated city and county, and plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several county and municipal officers and *employees* whose compensation is paid by such city or city and county . . . shall be elected or *appointed* . . .' Obviously, a civil service system is strictly a municipal affair. Under these provisions a chartered city or city and county may lawfully confer *quasi* judicial power on boards or commissions dealing strictly with municipal affairs, such as the power to determine facts, and, if such finding is made, the courts may interfere only where the board acts arbitrarily, capriciously, or fraudulently. . . . We, therefore, conclude that by charter provision a city or city and county may lawfully confer on local boards dealing with strictly municipal affairs judicial or *quasi* judicial power.'' (Pp. 60, 61.)

The quasi-judicial power of local boards and officers in determining disciplinary matters in connection with employees, has been upheld upon two theories: (1) that of cases like the Dierssen case, *supra,* 43 Cal.App.2d 53, applying the home rule provision of the Constitution, and (2) that of such cases as *Standard Oil Co.* v. *State Board of Equal., supra,* 6 Cal.2d 557, applying the former language of article VI, section 1 of the Constitution. ■ The purpose of the 1950 amendment to that section as shown by the arguments to voters was to reduce the number of inferior courts in the state, not to interfere in anywise with the quasi-judicial powers of boards and officers who are not courts in the sense of that section. (See *Chinn* v. *Superior Court,* 156 Cal. 478, 482 [105 P. 580].) ■ While in such cases as *Drummey* v. *State Board of Funeral Directors & Embalmers,* 13 Cal.2d 75 [87 P.2d 848], it has been held that because of the separation of powers required by article III of the Constitution state boards in proceedings to revoke licenses do not have the quasi-judicial powers which prevent a trial de novo on review, it is interesting to note that they do possess such powers in proceedings for the issuance of licenses. The power exerted in this case is a purely municipal affair and the voters in reducing the number of inferior courts never intended to, nor did they, in any way interfere with the rights granted municipalities, counties and cities and counties in the other portions of the Constitution. ■ The elimination of the power of the Legislature to provide other inferior *courts* than the municipal and justice courts still left the constitutional provisions under which the charter of a city and county could lawfully confer quasi-judicial powers on boards or commissions dealing strictly with municipal affairs. Without the former wording of section 1, article VI, and with the present inhibitions against the establishment of any inferior court other than the municipal and justice, there is nothing inconsistent between a charter so providing and the present provisions of the Constitution. Such a charter is "consistent with and subject to this Constitution." (Art. XI, § 8.)

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 15, 1953, and appellant's petition for a hearing by the Supreme Court was denied August 13, 1953.