[L. A. No. 26914.   In Bank.   Jan. 31, 1963.]

THE RUBEROID COMPANY, Plaintiff and Respondent, v. CALIFORNIA UNEMPLOYMENT INSURANCE AP-PEALS BOARD et al., Defendants and Appellants.

Stanley Mosk, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Defendants and Appellants.

Charles P. Scully as Amicus Curiae on behalf of Defendants and Appellants.

Paul, Hastings, Janofsky & Walker and Dennis H. Vaughn for Plaintiff and Respondent.

Gibson, Dunn & Crutcher and Willard Z. Carr, Jr., as Amici Curiae on behalf of Plaintiff and Respondent.

TOBRINER, J.—We face the question in this case whether the statutory provision as to "a trade dispute" bars the collection of unemployment insurance by a striking employee whom the employer has discharged and permanently replaced. We hold that since the permanent replacement at once prevents any choice or volition on the part of the worker to return to the job and since it severs the trade dispute as the cause of the unemployment, the disqualification of the section no longer operates. We set forth hereafter in more detail the basis for this conclusion.

Defendants appeal from a judgment vacating certain decisions granting unemployment compensation benefits to specified claimants and directing the issuance of a writ of mandate ordering the removal of all charges against the plaintiff's or its predecessor's unemployment reserve account because of the award of such benefits.

The facts are undisputed. Plaintiff's predecessor, The Mastic Tile Corporation of America, manufactured floor tile at its plant in Long Beach until about September 30, 1959, when plaintiff, the Ruberoid Company, acquired its assets. The Department of Employment transferred and assigned Mastic's reserve account to plaintiff as the "successor employer." Plaintiff continued thereafter to maintain and operate the plant. The International Chemical Workers Union, Local Union No. 1, AFL-CIO, represented Mastic's employees; the present claimants for unemployment insurance benefits were members of that union.

The collective bargaining agreement between Mastic and the union expired on September 1, 1958. The parties failed to reach a successor agreement, and all of Mastic's 281 employees, 265 of whom were members of the union, went out on strike on September 21, 1958. The union immediately established picket lines.

On October 2, 1958, Mastic sent to all employees a letter stating that it intended to resume operations and that all employees who did not return to work on or before October 7, 1958, would be permanently replaced.[1] About 40 employees returned to work. Mastic then began hiring replacements for those who did not return. On October 17, 1958, Mastic mailed to all employees still on strike notice that they had been permanently replaced and enclosed a check for their pro rata vacation pay to the date of the strike.[2]

---

[1]The letter read:

"To All Mastic Tile Corp. Employees:

"At the present time, there is no indication when the strike called by the International Chemical Workers Union, Local No. 1, at the Company's Long Beach plant, will end. The Company has, therefore, decided to resume operations as soon as possible.

"If you return to work on or before October 7, 1958, you will find a job available for you. Unless you report available for work by October 7, 1958, however, you will be permanently replaced."

[2]This letter read:

"Dear Mr._____:

"We advised you, by letter dated October 2, 1958, that unless you reported available for work by October 7, 1958, you would be permanently replaced.

"This letter is to advise you that you have now been permanently replaced.

"Enclosed is check number____dated October____, 1958 in the sum of $_____ for pro rata vacation pay covering the period to September 21, 1958, the day on which you went out on strike against this company."

On November 3, 1958, Mastic filed a representation petition with the National Labor Relations Board, requesting that an election be held to determine whether Local Union No. 1 represented a majority of Mastic's employees. The board determined that the strikers who had not returned had been permanently replaced and were ineligible to vote in the ensuing representation election. On March 13, 1959, the board held an election; only the new and returned employees participated. The board certified that the old union no longer represented Mastic's employees as the exclusive bargaining representative. On March 28, 1959, the picketing ceased and the strike terminated.

Between October 17, 1958, the time of notice of their permanent replacement, and March 28, 1959, the end of the strike, 15 claimants (i.e., striking employees who filed claims for unemployment insurance benefits) applied for work at Mastic. Eight of these claimants were not hired. Of the seven claimants who were reemployed, one was hired two days after application, one, 10 days after application, two, 30 days after application; three, 60 days after application. Upon resumption of work, the rehired employees lost all former rights based on prior employment with Mastic, such as seniority privileges; they returned as new employees.

During the course of the strike employees at various times filed claims with the Department of Employment of the State of California; the department granted unemployment compensation benefits for the period from October 17, 1958, to the time of reemployment at Mastic or elsewhere. The California Unemployment Insurance Appeals Board affirmed. Respondent then initiated this proceeding in mandamus to set aside the board's decisions. The trial was a trial de novo; the parties, however, submitted the matter on the records of the administrative proceedings.

The trial court found that the claimants continued to be unemployed "solely by reason of . . . the trade dispute" and their refusal "in accordance with their Union principles, to cross the picket line." The court concluded that the evidence did not support the appeal board's determination that the permanent replacement was the direct and proximate cause of their unemployment after October 17, 1958. Accordingly, the trial court entered a judgment which set aside the appeal board's decisions granting unemployment insurance benefits. The court further ordered the removal of all charges against the reserve account of respondent or Mastic with respect to

any benefits paid to the claimants, except for periods of unemployment subsequent to unsuccessful applications for reemployment made between October 17, 1958, and March 28, 1959.

Section 1262 of the Unemployment Insurance Code provides: "An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

We have recognized that this section expresses the two-pronged and balanced purpose of the state to maintain its neutrality in trade disputes. As Justice Traynor states in *Matson Terminals, Inc.* v. *California Emp. Com.* (1944) 24 Cal. 2d 695, 707 [151 P.2d 202] : "The act establishes a policy of neutrality in trade disputes by provisions that the payment or withholding of benefits should not be used to aid either party to a trade dispute. Thus the provision disqualifying a worker who leaves his work because of a trade dispute § 56(a) is balanced by the provision that other unemployed workers shall not be required to fill the vacated jobs or lose their right to unemployment insurance benefits. (§ 13(b)(1).) The payment of benefits to a claimant who leaves his work because of a trade dispute would conflict with this policy just as would the withholding of payments because a claimant refused to become a strikebreaker."

We have construed the section in light of the whole legislative design of relieving workers from the ill effects of unemployment which they have neither willed nor caused. Thus we have said that the disqualification of the section must rest upon two elements: the worker must voluntarily leave or remain away from his employment and the worker must leave or remain away from his employment because of a trade dispute. As we shall describe in more detail, the first prerequisite involves a volitional test and the second, a causational test.

*Bodinson Mfg. Co.* v. *California Emp. Com.* (1941) 17 Cal.2d 321 [109 P.2d 935], establishes the volitional test, holding that the unemployment must result from the voluntary act of the employee and not from the acts of others. In sustaining the disqualification of the worker who voluntarily refused to cross the picket line of a union other than his own,

we said: "In brief, disqualification under the act depends upon the fact of voluntary action, and not the motives which led to it. The legislature did not seek to interfere with union principles or practices. The act merely sets up certain conditions as a prerequisite to the right to receive compensation, and declares that in certain situations the worker shall be ineligible to receive compensation. Fairly interpreted, it was intended to disqualify those workers who *voluntarily leave their work because of a trade dispute.*" (P. 328; emphasis added.) To the same effect: *Matson Terminals, Inc.* v. *California Emp. Com.* (1944), *supra*, 24 Cal.2d 695; *McKinley* v. *California Emp. etc. Com.* (1949) 34 Cal.2d 239 [209 P.2d 602].

The causational test finds its genesis in the clear language of the statute. The section denies benefits for the period an employee remains out of work *"by reason of* the fact that the trade dispute is still in active progress" (emphasis added). Thus in *Mark Hopkins, Inc.* v. *California Emp. Com.* (1944) 24 Cal.2d 744 [151 P.2d 229, 154 A.L.R. 1081], we faced the question whether an employee who had taken another job during a trade dispute and thereafter had again become unemployed should then receive benefits during the course of the trade dispute. We held that in order to break the causal chain the subsequent employment must represent a bona fide attempt at permanent employment. Noting that " [a] claimant is thus ineligible for benefits if the trade dispute is the direct cause of his continuing out of work," (p. 748) we said: "The termination of a claimant's disqualification by subsequent employment thus depends on whether it breaks the continuity of the claimant's unemployment and the causal connection between his unemployment and the trade dispute. Such employment must be bona fide and not a device to circumvent the statute." (*Ibid.*)

In the instant case neither the volitional nor causational test operates to bar claimants. Although the trial court rendered a contrary decision, the facts here are not in dispute, and we are not bound by its conclusions. We must here ascertain the proper conclusion indicated by the probative facts presented by the record. As we said in *Mark Hopkins, Inc., supra,* "A legal conclusion clearly based on findings of probative facts requiring a different conclusion is invalidated by such probative facts. [Citing cases.] " (P. 751.)

As to the first test, that of volition, the employee here could

hardly voluntarily remain away from a job that had ceased to exist. Here the employer's discharge and replacement of the striking employee precluded the exercise of his volition. The worker could no longer choose to return to the waiting job or remain on strike. In permanently filling the job the employer foreclosed the option. Whether or not the employee would thereafter have left or crossed the picket line to fill the job became a moot and academic question.

Turning to the test of proximate causation, we believe that the trade dispute did not serve as the proximate cause of the unemployment after the employer permanently replaced the striking employees and severed his relationship with them. In analyzing the corollary situation in which the striking employee thereafter accepts permanent employment, we have held that such employee's permanent full-time employment terminates the former relationship and the disqualification. Thus in *Mark Hopkins, Inc.* v. *California Emp. Com.* (1944), *supra,* 24 Cal.2d 744, Justice Traynor pointed out: "Only permanent full-time employment can terminate the disqualification. If bona fide, it completely replaces the claimant's former employment, terminating whatever relation existed between the claimant and his former employer. . . ." (P. 749.) (See Feldman, *The Garden of Live Flowers: Terminating the Trade Dispute Disqualification under the California Unemployment Insurance Act* (1953) 27 So. Cal. L. Rev. 3, 33 et seq.) The employer's permanent replacement of the employee operates in the same manner.

The importance of the severance of the employer-employee relationship becomes obvious upon an analysis of the economic elements involved. By replacement and loss of his job the employee loses not only the job itself but its concomitants, such as seniority, bonuses, the measure of compensation payable for the particular job, vacation and sick leave rights, and pension rights. Even if the striking employee were later to be reemployed as a new employee, he might very well be assigned to a job of less desirability; the skilled worker, for instance, could be given a less skilled job. He might be placed upon a different shift which offered less favorable hours or working conditions. In an industrial society the disruption of the relationship between the erstwhile employer and employee signifies to the worker a deep and vital loss.

The situation in the instant case may be analogized to that in *Bunny's Waffle Shop* v. *California Emp. Com.* (1944) 24

Cal.2d 735 [151 P.2d 224]. In that case the local joint executive board that represented the local unions of restaurant employees refused to bargain with a newly formed organization of employers, insisting, instead, upon negotiating with individual employers. To overcome this resistance and to force the employees to bargain with the new organization, the employers sharply reduced wages, extended the work week, and instituted split shifts. As a result, a number of employees quit work. The employers then closed the restaurants. The ensuing claims for unemployment benefits posed the question of whether the trade dispute provision disqualified those workers who had left their jobs because of the newly imposed conditions of work.

. The employers argued that, since the employees left their jobs because of the changed conditions, which in turn resulted from the trade dispute, the employees could not receive benefits. In rejecting this contention we explained that we must look beyond a finding of the presence of a trade dispute or a finding of causation of the unemployment by that trade dispute. The loss of benefits must be attributable to a trade dispute which is the *direct* cause of the unemployment. We concluded that the wage reduction and changed work schedule, although indirectly caused by the trade dispute, operated as the direct cause of the unemployment, and that the employees were not therefore barred from benefits. We said, ''When the new conditions of work were finally announced by the employers, they were not offered as bona fide proposals for the continued operation of the employers' places of business, but were imposed for the sole purpose of coercing the unions into bargaining collectively with the employers' representative and were to continue only until the union agreed to do so. Admittedly they were an economic weapon designed to compel compliance with the employers' demands, and when claimants left their work, *they left because of this economic weapon and not because of the trade dispute then in existence. The fact that the trade dispute was unquestionably the motivating cause of the employers' acts does not establish any direct causal relation between the dispute and the employees' leaving of work.''* (Pp. 740-741; emphasis added.)

. While in the present case the trade dispute directly caused the initial unemployment, the disqualification on that basis terminated when the employer permanently replaced the striking employees. At that moment of time *the act of the employer became the direct cause of the unemployment.* Once the strik-

er's job was filled, as the letter of October 17 stated, the replacement became the intervening event which cut off the dispute as the cause of the unemployment. By the replacement the employer completely terminated any relationship with the worker. The replacement broke any further connection between the original dispute and the conduct of the worker. From and after the advent of the replacement it and not the dispute became the cause of the unemployment.

If we may invoke an analogy, the prospective theatergoer who hesitates to purchase a ticket no longer retains an option to attend the performance once the management has sold all the seats. The occupancy of the theater destroys the theatergoer's possibility of exercising volition as to attending the performance. The cause of his nonattendance becomes, at that point, the full occupancy of the theater rather than the failure to buy a ticket. The union member who debates whether he should participate in the picketing or cross the picket line exercises no more effective choice than the theatergoer. Even if the worker were to decide to abandon the picketing or cross the line, the opportunity for effective decision or for realistic volition on his part is foreclosed as of the time the employer replaces him with another worker and terminates their relationship.

We cannot accept plaintiff's answering contention that *Thomas* v. *California Emp. Stab. Com.* (1952) 39 Cal.2d 501 [247 P.2d 561], controls the present issue and sustains the disqualification. As we shall explain, *Thomas* differs from the case before us on both the volitional and causational grounds. In *Thomas* the logging employees went on strike, establishing a picket line at the company's sawmill. The claimant plant and mill employees refused to cross the line. The company thereupon closed the plant, giving the employees notice of "employment termination." Three days after the termination the employer requested the striking workers to return to their jobs immediately or upon the expiration of the strike. A second notice, sent a number of weeks later, stated that the strikers were still employees of the company and repeated the request to return to work. The strikers did not heed either request.

In upholding the disqualification of the strikers we found that they voluntarily refused to take jobs that were tendered to them and that the cause of such refusal lay in the trade dispute. Although the employer discharged the plant and mill workers from a technical employment relationship, the jobs

remained. We said in *Thomas* ". . . claimants did not respond to two notices given by the company to all employees on or about January 21 and February 18 requesting that they return to work immediately or as soon as strike conditions cease to exist." (P. 506.) We pointed out that nothing in the record indicated that the original termination notices "caused claimants to remain out of work after January 18 or had anything to do with their determination to remain away from their jobs." (P. 506.) Hence in *Thomas* the cause of the unemployment abided in the continued refusal of the claimants to accept the employer's invitation to the waiting jobs.

The instant case differs from *Thomas* in both of the two essential elements for disqualification which we have described above. The employer here did not merely discharge the striking employees; it permanently replaced them and disrupted any relationship with them; it thereby deprived them of any voluntary choice of crossing the line and regaining employment in their former status. The employer liquidated the strikers' jobs, which were the cause and occasion of the trade dispute. The employer terminated the relationship with the employee that subsisted in *Thomas*. The employer broke the chain of causation between the trade dispute and the unemployment and put in place of the dispute, as the proximate and direct cause of the unemployment, its own counteraction.

As we have pointed out, this court held in *Bunny's Waffle Shop, supra,* that the intervention of the employer in basically changing the wages and working conditions that attached to the job broke the chain of causation. Here the intervention of the employer went further : it eliminated, as to this worker, the job itself and destroyed the worker's possibility of regaining it. This intervention severed the chain of causation even more drastically than in *Bunny's Waffle Shop, supra,* and insulated the prior acts of the worker in leaving the job.

In view of the fact that the employer's action removed the elements of volition and causation, superimposing the replacement in place of the trade dispute as the direct cause of the unemployment, the disqualification ceased; defendant correctly granted benefits after the date of the permanent replacement. Accordingly, the trial court erred in ordering the removal of such charges from plaintiff's reserve account.

While appellants contend that a denial of benefits would present a serious question as to compliance by the California unemployment compensation scheme with federal require-

ments, our disposition of the case renders unnecessary our consideration of that question.

The judgment is reversed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and White, J.,* concurred.

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.