[Civ. No. 23000.    First Dist., Div. Three.    Aug. 15, 1967.]

GENERAL MOTORS CORPORATION, Plaintiff and Respondent, v. CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al., Defendants and Appellants; FLOYD M. BUENO et al., Interveners and Appellants.

Thomas C. Lynch, Attorney General, and Clayton P. Roche, Deputy Attorney General, for Defendants and Appellants.

G. Ernest Lopez and Richard D. King for Interveners and Appellants.

Pillsbury, Madison & Sutro, Charles F. Prael, Noble K. Gregory, Charles E. Voltz and Walter R. Allan for Plaintiff and Respondent.

SALSMAN, J.—This is an appeal from a judgment of the superior court directing appellant California Unemployment Insurance Appeals Board to set aside its orders determining that certain claimants, employees of respondent General Motors Corporation, are entitled to unemployment insurance benefits, and further ordering appellant Albert B. Tieburg, as Acting Director of Employment, to remove and cancel certain charges made against the reserve account of the General Motors Corporation as a result of the payment of unemployment insurance benefits to employees of the corporation.

General Motors Corporation manufactures and assembles automobiles at many plants located throughout the United States. The two plants involved in this controversy are located at Van Nuys and at Oakland, California. Each of these plants is entirely engaged in the assembly and production of Chevrolet automobiles. At each plant, separate but highly coordinated groups of workmen join in the work of assembly and production. At each plant, employees of General Motors' Fisher Body Division produce the bodies for Chevrolet automobiles on an assembly line. Chevrolet Division employees prepare the chassis to receive its Fisher body as it moves along a separate assembly line. The two lines join and ultimately a completed vehicle emerges.

The International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (hereafter referred to as UAW or the union) represented General Motors employees in labor matters and was their sole bargaining representative. There were local unions at both Van Nuys and Oakland, each affiliated with and subject to the control and direction of the UAW. At Oakland, Fisher Body Division employees belonged to one local union, Chevrolet Division employees to another. At Van Nuys, Fisher Body employees and Chevrolet Division employees belonged to the same local union.

In June 1961 General Motors and the UAW began negotiations for a new labor contract. Negotiations centered on three main types of issues: national economic, national noneconomic and plant-level or local issues. Settlement of any issue was contingent upon settlement of all issues. Negotiations

on behalf of the UAW were conducted by its national negotiating team, and claimants herein were represented on the national negotiating team through delegates elected to subcommittees from which some of the members of the national negotiating team were chosen.

During the course of negotiations, the UAW authorized a nationwide strike vote in all General Motors plants. Employees of the Fisher Body Division and the Chevrolet Division, in both the Van Nuys and Oakland plants, voted to authorize a strike against General Motors in support of their national and local demands. Negotiations between the UAW and General Motors continued, but the UAW fixed a strike date of August 31st, later postponed to September 11th. On September 8th the UAW sent a telegram to its locals advising them that General Motors had been notified that the members in each plant had been authorized to ''take strike action as of 10:00 a.m., (E.S.T.) Monday, September 11, 1961 if they are unable to resolve their local plant problems.'' When the UAW sent this telegram to its locals, the national negotiating team had not yet resolved non-economic national contract issues to its satisfaction. Before the telegram was sent, it was shown to negotiators for General Motors, who protested that it was, in effect, a directive to strike and would be so understood by employees at the local level. The president of UAW agreed that ''This is going to bring about a strike.'' On September 11th, some local unions struck on the ground that they had been unable to resolve their local plant problems. Other locals took strike action, despite settlement of local issues, while at other plants there was no strike, even though local issues were unsettled. The same day, the president of UAW, when asked if the unions had called a general strike against General Motors, replied: ''It's up to the plants, but it's an academic question because, as common sense would dictate, with the operation as highly integrated as General Motors, it's only a matter of a couple of days anyway before all of the corporation will be closed down.''

At the Van Nuys and Oakland plants Chevrolet Division employees took strike action. At Oakland, Fisher Body employees took no strike action, but no work was available for them as a practical matter because Chevrolet employees were not working and there was no place to use or store Fisher bodies. At the Van Nuys plant, Fisher Body employees took strike action on September 11th, but settled their local issues

on the 14th, and offered to return to work. As in the case of the Oakland plant, however, there was no work for them to do because of the Chevrolet Division strike.

During the strike, Fisher Body employees were directed by union officials to apply for unemployment insurance benefits. Union strike benefits were made available to those employees who could not obtain unemployment insurance payments, but the union expressly notified such employees that, if they received strike benefits and later obtained unemployment insurance funds, they were to repay strike benefits to the union.

By September 20, 1961, the national negotiating team had achieved tentative agreement with General Motors at Detroit on remaining national issues, and the following day Chevrolet workers were back on the job at the Van Nuys plant. On the 24th the UAW executive board in Detroit voted to end the strike against General Motors at midnight, and the next morning production began at the Oakland plant.

The new labor contract between the UAW and General Motors was ratified by the membership of the union, including the claimants whose satisfied claims to unemployment insurance benefits gave rise to this action. By the terms of the settlement agreement, members of the union, including claimants, received substantial benefits, such as an increase in wages, free medical insurance, improved pension allowances, life insurance and supplemental unemployment insurance benefits.

The trial court found that all claimants at both the Van Nuys plant and the Oakland plant were out of work during the period for which they claimed unemployment insurance benefits, solely by reason of a trade dispute, and concluded that under the provisions of section 1262 of the Unemployment Insurance Code they were not entitled to unemployment insurance benefits. The trial court further found, in effect, that the claimants' offers to return to work or to remain at work, while Chevrolet production employees were out on strike, were part of the strategy of the UAW to force a complete shutdown of all operations at each of the plants, yet at the same time obtain state unemployment benefits in lieu of strike benefits for Fisher Body employees who were not on strike or who had offered to return to their employment.

Appellants first contend that the "probative facts" are not in dispute, and that therefore this court is not bound by the

trial court's findings of fact, but must determine the facts for itself and thereafter apply the law to the facts found.

We think appellants misinterpret the rule applicable to appellate review of the rulings of the California Unemployment Insurance Appeals Board. ■ As the court pointed out in *Thomas* v. *California Emp. Stabilization Com.*, 39 Cal.2d 501, 504 [247 P.2d 561], the board is a statutory agency without power to make final determinations of fact. Its rulings are subject to limited trial de novo in the superior court. Upon trial de novo the judge must examine the administrative record and exercise his independent judgment as to the value, effect and weight of the evidence. (*Caro* v. *Savage*, 201 Cal.App.2d 530, 539 [20 Cal.Rptr. 286].) He may draw his own inferences from the evidence in the record, and where the evidence is subject to conflicting inferences, those drawn by the trial court must prevail if supported by substantial evidence. ■ If the trial court's ruling is challenged by appeal, the familiar substantial evidence test applies. If substantial evidence supports the trial court's findings of fact, the appellate court may disregard the conflicting evidence, resolve conflicting inferences in favor of the prevailing party, and affirm the judgment. (See *Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308, 309 [196 P.2d 20]; *Ashdown* v. *State of California*, 135 Cal.App.2d 291, 299 [287 P.2d 176]; Administrative Mandamus (Cont. Ed. Bar) § 15.25 at 281, § 15.26.) ■ It is only where the probative facts are not in dispute, and those facts clearly require a conclusion different from that reached by the trial court, that the latter's conclusions may be disregarded. Thus, in *Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744, 751 [151 P.2d 229, 154 A.L.R. 1081], the court noted that "A legal conclusion clearly based on findings of probative facts requiring a different conclusion is invalidated by such probative facts." (See also, *Ruberoid Co.* v. *California Unemp. Ins. Appeals Board*, 59 Cal.2d 73, 78 [27 Cal.Rptr. 878, 378 P.2d 102].)

■ The record before us is not without conflict. The evidence it contains is subject to different inferences. It necessarily follows that the inferences drawn by the trial judge must be sustained if they are reasonable and supported by substantial evidence.

Section 1262 of the Unemployment Insurance Code pro-

vides: "An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

The central issue in this appeal is whether the Fisher Body Division employees left their jobs because of a trade dispute. If they did leave their work because of a trade dispute, the law makes them ineligible for unemployment insurance benefits, and the reserve account of General Motors may not be charged for benefits paid to them. On the other hand, if they left their jobs for some other reason, and not because of a trade dispute, benefits were properly paid, and the reserve account of General Motors is subject to charge for the payments made.

We find ample evidence in the record to sustain the trial court's finding that Fisher Body Division employees voluntarily caused their own unemployment and were out of work solely by reason of a trade dispute.

In construing section 1262 of the Unemployment Insurance Code, the Supreme Court, in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], established a volitional test to determine the applicability of the trade dispute disqualification. The court there said: "In brief, disqualification under the act depends upon the fact of voluntary action, and not the motives which led to it. The legislature did not seek to interfere with union principles or practices. The act merely sets up certain conditions as a prerequisite to the right to receive compensation, and declares that in certain situations the worker shall be ineligible to receive compensation. Fairly interpreted, it was intended to disqualify those workers who voluntarily leave their work because of a trade dispute." (See also *Matson Terminals, Inc.* v. *California Emp. Com.*, 24 Cal.2d 695 [151 P.2d 202] ; *McKinley* v. *California Emp. etc. Com.*, 34 Cal.2d 239 [209 P.2d 602].) In *Ruberoid Co.* v. *California Unemp. Ins. Appeals Board, supra,* 59 Cal.2d 73, 77, the court declared that disqualification must rest upon two elements, namely, ". . . the worker must voluntarily leave or remain away from his employment *and* the worker must leave or remain away from his employment *because of* a trade dispute." (Italics

ours.) (See also *Coast Packing Co.* v. *California Unemp. Ins. Appeals Board,* 64 Cal.2d 76, 79 [48 Cal.Rptr. 854, 410 P.2d 358].) The first element noted involves the volitional test, the second a causational test. Both tests are fairly met here by any reasonable interpretation of the evidence.

There is evidence that demands by the UAW for a new contract of employment for all classes of workers represented by the union were at the core of the labor controversy between the UAW and General Motors. The Fisher Body Division employees were as much a part of that dispute as were the production employees of the Chevrolet Division. The UAW was the sole bargaining representative for employees of both divisions as well as for almost all General Motors hourly rated employees. Negotiations for the new contract concerned issues affecting all claimants. All were represented on the national negotiating team, directly or indirectly, by representatives chosen by themselves. Employees in the Van Nuys plant and the Oakland plant voted overwhelmingly to authorize the calling of a strike in support of their union's national and local demands. When the union later notified its various locals, including the locals to which all claimants belonged, that strike action was authorized as of September 11, 1961, most General Motors plants throughout the country, including those at Van Nuys and Oakland, were struck on that date. At the Van Nuys plant, Fisher Body employees and Chevrolet production employees walked off their jobs at the same time. It is true that, on the date set for the strike, Fisher Body employees in the Oakland plant had settled their local issues and were prepared to work, but Chevrolet production employees had walked out. As the president of UAW predicted, it was but a matter of a day or two until the entire, highly integrated work of General Motors was shut down.

When these facts are viewed in the light of the complex and highly integrated operations of General Motors Corporation, it is clear that the unemployment of the Fisher Body claimants resulted from their own voluntary action and that the voluntary test applied in *Bodinson, supra,* is fulfilled. It cannot reasonably be denied that a labor dispute, engendered in part at least by their own demands, was in progress and that the claimants were furthering its progress by all means at their command. Their personal responsibility for their own unemployment is evident. It cannot be laid at the

door of their employer. (*Chrysler Corp.* v. *California Emp. etc. Com.,* 116 Cal.App.2d 8, 16, 17 [253 P.2d 68].)

The same facts which fulfill the volitional test also meet the causational test described in *Ruberoid, supra.* Each of the separate acts of the UAW, taken in claimants' behalf and in furtherance of their demands, was a separate link in the chain of causation that ultimately resulted in the Van Nuys claimants leaving their employment and the Oakland employees being left with no work to do. The final steps, and the immediate and proximate cause of their unemployment, were their vote to strike in furtherance of their demands, and their act in responding to their union's strike call by leaving their jobs on the target date.

The evidence supports the trial court's issuance of mandate, and the judgment is therefore affirmed.

Draper, P. J., and Brown (H.C.), J., concurred.