STATE of Indiana, DEPARTMENT OF REVENUE, Defendant-Appellant,

v.

CALCAR QUARRIES, INC., Plaintiff-Appellee.

No. 1–379A78.

Court of Appeals of Indiana, First District.

Sept. 11, 1979.

Theodore L. Sendak, Atty. Gen., Joel Schiff, Deputy Atty. Gen., Indianapolis, for defendant-appellant.

James C. Tucker, Tucker & Tucker, Paoli, Michael R. Fruehwald, Barnes, Hickam, Pantzer & Boyd, Indianapolis, for plaintiff-appellee.

LOWDERMILK, Presiding Judge.

## STATEMENT OF THE CASE

Defendant-appellant State of Indiana, Department of Revenue (the State) appeals from the trial court's judgment granting plaintiff-appellee Calcar Quarries, Inc. (Calcar) a refund of certain sales and use taxes assessed and paid for the years 1970, 1971, and 1972.

## FACTS

Calcar is an Indiana corporation which operates a stone quarry, a hot mix asphalt plant, and a ready mix concrete facility on approximately sixty acres near Paoli, Indiana.

The State conducted an audit in 1974 and subsequently demanded payment of tax on certain purchases which Calcar contends are exempt from taxation. Calcar paid the amount claimed due, unsuccessfully sought a refund, and then filed an action in the Orange Circuit Court to recover the amount paid.

The trial court ordered a refund of the tax paid on purchases totalling $50,496.39 after finding these purchases exempt under IC 1971, 6–2–1–39(b)(4) (Burns Code Ed.). The trial court also ordered a refund of the tax paid on purchases totalling $48,164.98 after finding the purchases exempt under IC 1971, 6–2–1–39(b)(6) (Burns Code Ed.).

## ISSUES

1. Was Calcar engaged in public transportation within the meaning of IC 6–2–1–39(b)(4)?

2. Were certain items which were purchased or rented by Calcar directly used in the direct processing of tangible personal property and therefore exempt under IC 6–2–1–39(b)(6)?

## DISCUSSION AND DECISION

*Issue One*

IC 6–2–1–39(b) provides that the gross retail tax shall not apply to

"(4) . . . sale [and] . . . storage, use or other consumption in this state of tangible personal property or service which is directly used or consumed in the rendering of public transportation of persons or property."

The trial court found that

"25. . . . Calcar Quarries, Inc. is the possessor of a Certificate of Public Convenience and Necessity, issued on February 17, 1956, which gave the following authority as a public carrier to Calcar Quarries, Inc., which said authority was in full force and effect during all of 1970, 1971 and 1972, as follows:

'Road construction stone, agricultural limestone, limestone, sandstone, crushed stone and other stone, lime, lime products, sand, gravel, dirt, road building materials, road building machinery and supplies and mining equipment and supplies, quarrying equipment, bituminous road building materials of all kinds, concrete,

Over all Federal, State and County highways in the State of Indiana, south of U.S. Highway 40 for the transportation of those commodities usually and ordinarily handled by dump trucks, limiting all hauls to a distance not exceeding 50 miles from point of origin to point of destination.'

26. That Calcar engaged in public transportation of said commodities for hire, which said commodities allowed under the Certificate of Public Convenience and Necessity were produced at the Paoli Calcar Plant.

27. That crushed stone is sold at the Calcar Quarry Plant either to be delivered by trucks owned by others, or to be delivered by the Calcar trucks under the P.S.C.I. permit. The accounting systems have been set up so that stone is always charged separately but with a hauling charge added to stone delivered by Calcar trucks."

The State contends that Calcar was not engaged in public transportation but instead was engaged primarily in the service of hauling its own product.

The State has defined "public transportation" in Ind.Admin. Rules & Regs. (6–2–1–39)–11 (Burns Code Ed.) as follows:

"IV. . . . Public transportation shall mean and include the movement, transportation or carrying of persons and/or property for consideration by a common carrier, contract carrier, household goods carrier, carriers of exempt commodities, and other specialized carriers, performing public transportation service for compensation by highway, rail, air or water, which carriers operate under authority issued by, or are specifically exempt by statute or regulation from economic regulation of, the public service commission of Indiana, the interstate commerce commission, . . . however, the fact that a company possesses a permit or authority issued by the P.S.C.I., I.C.C., etc., does not of itself mean that such a company is engaged in public transportation unless it is in fact engaged in the transportation of persons or property for consideration as defined above. . . ."

Jerry Meadows is manager of Calcar's operations. Meadows testified that Calcar's trucks had been used for hauling crushed stone taken from Calcar's quarry and for hauling sand and other products which were not the products of Calcar's operations. According to Meadows, Calcar's hauling of property to its own job sites amounted to no more than ten percent of its crushed stone sales.[1]

The accounting records for the trucking operation were kept separate from those of the quarry, asphalt, and ready mix operation. Meadows stated that Calcar sold its products F.O.B. Calcar's plant.[2] When Calcar hauled stone taken from its quarry, the money received for hauling the stone was segregated on Calcar's accounting records from the amounts received for the stone itself.

■ The evidence proves that Calcar, while operating under authority of the public service commission of Indiana, transported property for consideration by highway and satisfied the State's definition of "public transportation." The trial court correctly held that Calcar was eligible to claim exemptions pursuant to IC 6–2–1–39(b)(4).

1. An auditor employed by the State testified that, when an item has been used for several purposes and only some of the purposes qualify the item for exemption, the taxpayer can gain exemption for the total amount of the purchase price of the item by showing that the item was used predominantly in an exempt manner.

2. IC 1971, 26–1–2–319 (Burns Code Ed.) provides:

"(1) Unless otherwise agreed the term F.O.B. (which means 'free on board') at a named place, even though used only in connection with the stated price, is a delivery term under which

(a) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this article [chapter] (section [26–1–]2–504) and bear the expense and risk of putting them into the possession of the carrier; . . .

* * *"

*Issue Two*

IC 6–2–1–39(b) provides that the gross retail tax shall not apply to

"(6) Sales of manufacturing machinery, tools and equipment to be directly used by the purchaser in the direct production, manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing of tangible personal property; . . . ."

Judge White emphasized in *Indiana Dep't of State Revenue v. RCA Corp.*, (1974) 160 Ind.App. 55, 62, 310 N.E.2d 96, 100:

". . . Indiana requires that for the sale to be exempt the property purchased must not only be 'used directly' in the manufacturing process (as do the statutes of other states) but that it must be '*directly* used . . . in the *direct* production, manufacture,' etc." (Original emphasis)

The trial court ordered refund pursuant to IC 6–2–1–39(b)(6) for the following items:

| Item | Purchase Price |
|---|---|
| 1. Ready mix truck rentals and repairs | $ 4,453.11 |
| 2. Asphalt equipment rental | 246.00 |
| 3. Supplies and repairs for bins | 900.35 |
| 4. New tractor-loader | 37,883.00 |
| 5. Parts for old tractor-loader | 3,531.36 |
| 6. Parts for stock truck | 59.44 |
| 7. Crane rental | 770.00 |
| 8. Parts for payloader | 321.72 |

■ *Items 1 and 2.* The State has not offered argument concerning Items 1 and 2. Accordingly, any error with regard to exemptions for these rental and repair costs has been waived. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

*Item 3.* Meadows testified that the bins served as holding bins and served as a foundation for the screening process. Crude stone is taken from the blasting area to the primary crusher. After the stone has been crushed, it is washed and then separated into various sizes by means of the screening process. The trial court did not err in finding that the bins were directly used in the direct processing of the stone.

*Items 4, 5, and 6.* Meadows testified that Calcar used the stock truck to carry crushed stone from the bins to the stockpiles after the stone had been sized. From the stockpiles the tractor-loaders transported crushed stone to feed the bins for the production of asphalt or concrete.[3] The tractor-loaders were employed also for mixing sand and stone.[4]

The trial court found that

"24. Calcar, within its plant located near Paoli, Indiana, operates a crushed stone, ready mix and hot mix asphalt plant. The entire plant is located on one area; the stone is mined on the premises, stockpiled on the premises, crushed and sized and separated on the premises, used in the making of hot mix asphalt on the premises, and put into trucks for the making of ready mix concrete on the premises.

\*    \*    \*    \*    \*    \*

33. That a Caterpillar tractor with front-end loader as referred to in paragraph twelve (12) of the findings above, was used for the purpose of hauling stone in the various stages of production, and that the use of said Caterpillar tractor with front-end loader was for the transportation of unfinished work in process in a continuous flow from one production step to another within Calcar's integrated operation.

\*    \*    \*    \*    \*    \*

36. That the older tractor with front-end loader, for which parts and supplies were purchased, as referred to in paragraph thirteen, above, was used directly to transport unfinished work in process in

---

3. Although the State implies that these bins were strictly for storage, Meadows testified that the sand and stone were put in the bins so that the flow of the materials could be regulated by use of gates.

4. Additionally, the tractor-loaders were used at times for loading stone from the quarry. The State acknowledges that this "possibly" constituted an exempt activity. We agree that it is an exempt activity.

a continuous flow from one production step to another within Calcar's integrated operations.

37. . . . materials and tangible property used to transport unfinished work in process in a continuous flow from one production step to another in Calcar's operation, is exempt from such taxation. . . ."

The trial court specifically found that the stone, concrete, and asphalt operations were integrated. This court cannot set aside a finding entered by the trial court unless that finding is clearly erroneous. Ind. Rules of Procedure, Trial Rule 52(A). In its argument the State has not acknowledged or challenged this finding but has simply ignored it.

The State emphasizes that not all of the stone taken from the quarry was used for making concrete or asphalt. Nevertheless, the evidence does prove that all of the stone used by Calcar in producing concrete and asphalt did come from its quarry. This fact lends support for the trial court's finding of an integrated operation. The concept of an integrated operation makes inappropriate the State's references to "pre-production" and "post-production" activities.

Having carefully reviewed the evidence, we must hold that the trial court did not err in finding that the stock truck and tractor-loaders were used primarily for the purpose of transporting unfinished work in process from one production step to another. Accordingly, the trial court was correct in permitting exemptions for the amounts paid for purchase and repair of these items because they were directly used in direct processing and production.

*Item 7.* Meadows testified that Calcar rented the crane for use in constructing its asphalt plant. Obviously, this is not a direct use in the direct production of the asphalt. The trial court erred in finding that the rental amount was exempt under IC 6–2–1–39(b)(6).

*Item 8.* Meadows testified that the payloader was used solely for cleaning and maintenance purposes. Again we must hold that this is not a direct use in the

direct production or processing of Calcar's products.

This cause is remanded to the trial court for modification of the judgment by omitting that portion of the refund attributable to Items 7 and 8 above and adjusting the interest accordingly. When the judgment is modified in compliance with this order on remand, the judgment of the Orange Circuit Court will be in all things affirmed.

LYBROOK and ROBERTSON, JJ., concur.