DEPARTMENT OF REVENUE, STATE OF INDIANA, Appellant (Defendant Below),

v.

KIMBALL INTERNATIONAL, INC., Appellee (Plaintiff Below).

No. 49A02–8705–CV–210.

Court of Appeals of Indiana, Third District.

March 21, 1988.

Rehearing Denied April 29, 1988.

Linley E. Pearson, Atty. Gen., Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for appellant.

Samuel A. Fuller, of counsel, Lewis, Kappes, Fuller & Eads, Indianapolis, for appellee.

HOFFMAN, Judge.

The Department of Revenue, State of Indiana, (the Department) appeals a decision allowing an exemption from the State Gross Retail Tax. IND.CODE § 6–2.5–1–1

*et seq.* (1982). The trial below was a consolidation of three cases and the trial court's ruling permitted the appellee Kimball International, Inc. (Kimball) to claim exemptions on a variety of items. The Department has elected to appeal only a portion of these items and thus the issue on appeal is: whether Kimball's spray booths, air make up units and their associated component parts are exempt from the State Gross Retail Tax.

As pertinent here, Kimball is in the business of manufacturing finished wood products and components, including pianos, speaker cabinets and furniture. Through the concerted efforts of its several divisions, Kimball's manufacturing process extends from milling the uncut logs to shipping the ultimate product.

The spray booth and air make up units come into play during the final phase of the manufacturing process, when the finish is applied. After the wood products are assembled and prepared, they are moved by conveyor into finishing rooms. The finishing rooms are isolated from the rest of each plant by separate walls and positive air pressure. The spray booths and air make up units are found inside the finishing rooms.

The spray booths are three-sided structures and also include fans, water baths and duct work. The spray booths are designed so that overspray and evaporated solvents are exhausted from the finishing rooms through the water baths and duct work to the outside.

The air is exhausted from the finishing rooms at a rate of 120,000 cubic feet per minute, thus creating a need for an air in-take system. This is the function of the air make up units which include fans, filters, heaters and duct work. In addition to bringing in outside air, the air make up units heat the air and control its humidity.

Also at issue in this appeal is the spray booth coating and paint deflocculent. The spray booth coating is essentially a specialized removable paint applied to the spray booth walls and designed to promote collection of excess spray. The paint deflocculent is a chemical added to the water baths that holds the excess spray in suspension and also promotes its removal.

At trial, the Department did not introduce any evidence; however, Kimball, through expert testimony and exhibits, demonstrated that the spray booths and air make up units serve a variety of roles in the manufacturing process. The air make up units are responsible for maintaining the finishing room's positive air pressure, which prevents dust and other particles from entering the rooms and settling on the freshly applied finish. The air make up units also control the temperature and humidity in the room, which increases the air's capacity to absorb the excess solvents. Without the temperature and humidity controls a condition called "blushing" would occur where the finish becomes cloudy and the product unsaleable.

It was undisputed that collecting and removing the excess spray by use of the spray booths, spray booth coatings, water baths, and paint deflocculents is critical from a safety standpoint. The chemicals Kimball uses are highly flammable and without constant cleansing, the air in the finishing rooms would quickly become explosive.

It was also uncontroverted that the combination of the air make up units and the spray booths creates an airflow that is essential to the manufacturing process. This air movement promotes drying of the newly applied finish. Without this predrying a condition called "blistering" would occur during the later oven drying stage whereby trapped solvents would create bubbles in the finish. The airflow is also responsible for controlling sags and runs in the newly applied finish by improving the uniformity of the spray.

The transactions involved here occurred between 1976 and 1978, and the statutory exemption in effect at the time was IND. CODE § 6–2–1–39(b)(6).[1] In pertinent part, this section provided that the State Gross Retail Tax would not apply to:

---

**1.** This provision was repealed in 1980, and essentially the same exemption is found at IND.

CODE § 6–2.5–5–3 (1982).

"(6) Sales of manufacturing machinery, tools and equipment to be directly used by the purchaser in the direct production ... of tangible personal property[.]"

This exemption has been frequently litigated and in the present case, as in the previous cases, qualification for the exemption is highly fact sensitive.

The general rule is that tax exemptions are strictly construed in favor of taxation and against the exemption. *Beasley v. Kwatnez* (1983), Ind.App., 445 N.E.2d 1028. The taxpayer has the burden of establishing qualification under the strict terms of the exemption. The trial court in this case found that the evidence as introduced by Kimball established an entitlement to the exemption. On appeal, the Department does not seriously question the court's findings of fact, instead the argument to this Court is essentially that, as a matter of law, Kimball is not entitled to the exemption.

The Department's position is primarily based on its interpretation of the case of *Ind. Dept. Rev. v. RCA Corp.* (1974), 160 Ind.App. 55, 310 N.E.2d 96. *RCA* was the first case interpreting this exemption and there the Court of Appeals held that certain "environmental control" equipment was not exempt. RCA used the equipment to maintain a dust free environment in a room where picture tubes were manufactured. The court held the equipment was not "directly used in the direct production ...," because the machinery directly operated on the environment and not on the picture tubes, and because the evidence showed that without the equipment, the picture tubes could still be produced, although not as economically. In the present case, the Department argues that the same analysis applies to Kimball's spray booths and air make up units and that *RCA* mandates a reversal.

While *RCA* was the initial case interpreting this exemption statute, it is not the only, nor even the primary source of case law. In *Indiana Dept. of State Revenue v. Cave Stone* (1983), Ind., 457 N.E.2d 520, the Supreme Court surveyed the cases and attempted to harmonize and synthesize them into a single cogent method of deter-

mining qualification for this exemption. The core holding in *Cave Stone* was that to fulfil the "directly used in the direct production" requirement, the equipment must have an "immediate link with the product being produced." *Id.* at 525.

In *Cave Stone*, the equipment at issue was used to transport quarried stone through the various stages of the production process. The Supreme Court found this equipment to have the requisite immediate link because transportation was *essential* to the production process. Further, the court adopted the analysis of *Dept. of Rev. v. United States Steel* (1981), Ind. App., 425 N.E.2d 659. In that case the Court of Appeals found that safety equipment used by foundry workers was exempt, because it was an *integral* part of the manufacturing process. Also, the Supreme Court, in *Cave Stone*, made the point that the exemption does not require the equipment to work any particular transformation on the ultimate product. As an illustration of this point, the court approved *Dept. State Revenue v. Amer. Dairy* (1975), 167 Ind.App. 367, 338 N.E.2d 698, which approved an exemption for containers used to hold raw milk during the manufacturing process.

In *Cave Stone*, the Court also discussed the previously mentioned *RCA* case. The court found *RCA* to be consistent with its own holding by reading *RCA* to mean that the environmental control equipment was not essential or integral to the production process, because the picture tubes could have been produced without it. Interpreted this way, *RCA* is perfectly consistent with *Cave Stone;* however, in this case the Department is arguing that *RCA* stands for much more.

The Department uses portions of *RCA* to support the proposition that environmental control equipment is never exempt, because it operates directly on the environment and not on the product. The Department also finds in *RCA* a requirement that to be exempt equipment must have a positive effect on the product. This is clearly inconsistent with the Supreme Court's holding that the focus *is* on the whole process, and that the product does not have to be transformed by the equipment in question. The

apparent inconsistency created by *RCA* has been, and continues to be a source of confusion for all parties attempting to interpret and apply this important exemption statute. Accordingly, it is necessary to make clear that the extent that it stands for any point inconsistent with the controlling precedent of *Cave Stone, supra,* then *Ind. Dept. Rev. v. RCA, supra,* is hereby expressly overruled.

Without the support of *RCA* the Department's argument is without foundation. Based on *Cave Stone, supra,* to determine whether equipment has the requisite immediate link, the focus is on the entire manufacturing process. From this viewpoint, the equipment will be held exempt if it is an essential and integral part of an integrated process that produces tangible personal property.

Thus, in the present case, the trial court was required to examine the entire process Kimball uses to transform raw wood into finished wood products and determine if the spray booths, air make up units and their associated parts are essential integral parts of the entire manufacturing process. A review of the record reveals substantial, uncontroverted evidence confirming the trial court's finding that Kimball qualified for the exemption. Virtually every witness testified that without the spray booths, air make up units and associated parts, the manufacturing process would not be possible. It is true, as the Department contends, that the evidence shows that Kimball's process would be economically unfeasible and that *Cave Stone* at least implies that economics is not the appropriate measure. Nonetheless, the evidence also supports the findings that without the equipment Kimball's entire process would be impossible from an operational standpoint and from the standpoint of safety. Accordingly the trial court correctly found that Kimball qualified for the exemption.

Affirmed.

SHIELDS, P.J., and ROBERTSON, J., concur.