**GENERAL MOTORS CORPORATION,**
Petitioner,

v.

**INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.**

No. 49T05–8912–TA–00064.

Tax Court of Indiana.

Sept. 11, 1991.

Larry J. Stroble, Michael Rosiello, and Ronald d'Avis, Barnes & Thornburg, Indianapolis, for petitioner.

Linley E. Pearson, Indiana Atty. Gen. and Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

General Motors Corporation (GM) seeks a refund of Indiana Gross Retail Sales and Use taxes (sales/use tax) assessed and collected by the Indiana Department of State Revenue (Department) on expendable packing materials GM purchased and used in transporting certain automobile parts from one GM facility to another during the calendar years 1978, 1979, 1980, and 1981.

## FACTS

GM manufactures motor vehicles (automobiles). GM is a Delaware corporation with its principal places of business in Detroit, Michigan, and New York, New York. GM is organized as a vertically integrated production process, manufacturing automobile parts at component plants and then transporting these parts to other GM plants for final assembly. Throughout the calendar years of 1978 through 1981, GM owned and operated several component plants in Indiana. GM purchased expendable packing materials, such as corrugated cardboard cartons, separators, liners, pads, wrapping paper, plastic plugs, pallets, and other items (packing materials), to protect the parts during shipment to assembly plants outside of Indiana. The packing materials were used to package and protect products, such as lamps, transmissions, and other automobile parts, when shipped from one GM facility to another (component plant to assembly plant).

In audits prior to 1978, the Department allowed an exemption from sales/use tax for GM's packing materials. After a succeeding audit, however, the Department assessed sales/use tax on identical packing materials purchased in the tax years 1978 through 1981, which GM paid with interest in 1984, 1985, and 1986.

On December 23, 1986, GM timely filed claims for refund of the sales/use tax and interest paid on both its purchase of the packing materials and other items on behalf of some of its divisions in the aggregate amount of $2,082,009.47. GM filed its original tax petition for refund of sales/use tax on December 12, 1989, although the Department has not issued a final determination concerning GM's claims for refund.[1] Prior to the trial in this case, the parties settled all the issues involved in GM's claims for refund except the issue involving the tax treatment of GM's packing materials. Concerning this remaining claim, GM seeks a refund of sales/use tax and interest in the amount of $453,266.25 paid on its

---

1. The Indiana Tax Court has jurisdiction to hear GM's refund appeal because GM filed its appeal *before* the Department's decision was issued and *more* than one-hundred and eighty-one days after GM filed its claim for refund with the Department. IND.CODE 6–8.1–9–1(c).

purchase of packing materials for the years at issue.

Additional facts will be included as necessary.

## ISSUES

I. Whether GM's purchases of packing materials are exempt from sales/use tax because they are used within an integrated production process entitling GM to a refund?

II. Whether GM is entitled to receive interest from the Department on the interest portion of its overpayment that the Department held? If so, what is the applicable interest rate and period of accrual?

## I. EXEMPTION

■ GM claims its packing materials are exempt from sales/use tax under IND. CODE 6-2-1-39(b)(6) and its successor IND.CODE 6-2.5-5-3 (1980) (collectively referred to as the equipment exemption).[2] The sales/use tax statutes provide an exemption for manufacturing equipment directly *used* in the direct production of other tangible personal property:

Sales of manufacturing machinery, tools and equipment to be *directly used in the direct production,* manufacture, fabrication, assembly, extraction, mining, processing, refining or finishing of tangible personal property; sales of agricultural machinery, tools and equipment to be *directly used* by the purchaser *in the direct production,* extraction, harvesting or processing of agricultural commodities; and sales of tangible personal property to be *directly used* by the purchaser *in the direct production* or manufacture of any such manufacturing or agricultural machinery, tools and equipment.

IC 6-2-1-39(b)(6) (emphasis added).

In 1980, the equipment exemption was recodified, providing:

Transactions involving manufacturing machinery, tools, and equipment are exempt from the state gross retail tax if the person acquiring that property acquires it for his *direct use in the direct production,* manufacture, fabrication, assembly, extraction, mining, processing, refining, or finishing of other tangible personal property.

IC 6-2.5-5-3(b) (emphasis added).

The double direct standard, expressed in the statutory language emphasized above, is the touchstone of the equipment exemption from sales/use tax. In *Indiana Department of State Revenue v. Cave Stone, Inc.* (1983), Ind., 457 N.E.2d 520, the seminal case interpreting the double direct standard, the Indiana Supreme Court recognized the *essential and integral test* to determine whether the double direct standard is met. The court held the transportation equipment at issue was both essential to transforming crude stone into a marketable product and integral to "the ongoing process of transformation." *Id.* at 524.

The court's inquiry focused on the production process itself, defining it broadly to encompass all the production steps involved in transforming work in process into a finished marketable product:

The [equipment exemption] statute circumscribes all of the operations or processes by which the finished product is derived. Thus, we find that the production or processing of the stone begins at the time of the initial stripping, drilling, and blasting at the quarry and ends at the time the stone is stockpiled. The production process is continuous and indivisible.

The issue, then, is whether the transportation is an integral part of the production or processing of the stone.

*Id.* at 524. Consequently, the equipment exemption's double direct standard is met when the manufacturing equipment used is an essential and integral part of an integrated production process.

2. GM further claims exemptions under IND. CODE 6-2-1-39(b)(10) (1979), IND.CODE 6-2-1-39(b)(11) (1979), IND.CODE 6-2.5-5-4 (1980), IND.CODE 6-2.5-5-5.1 (1981, and IND.CODE 6-2.5-5-6 (1980). The court's decision makes it unnecessary to address GM's claims under these statutes.

## ESSENTIAL AND INTEGRAL

The Department does not dispute GM's assertion that its packing materials are both essential and integral to its production of finished automobiles. GM asserts its packing materials are essential to protect automobile parts during shipment to the final assembly plants and to aid convenience and safety in loading and unloading. The evidence reveals that without such protection, the parts could be scratched, broken, or otherwise damaged and consequently, unusable for installation as part of a finished automobile.

Packing materials are integral to GM's production process because they function within the integrated series of steps necessary to produce a finished automobile. Indeed, unless the parts are carefully transported from component plants to assembly plants, no marketable automobiles could result. *See Id.* at 524. The court therefore finds GM's packing materials are an essential and integral part of producing a finished automobile.

## INTEGRATED PRODUCTION PROCESS

The parties agree GM's packing materials are exempt if they are used within an integrated production process and are taxable if they are used outside the scope of an integrated production process. The facts in the case[3] as well as previous judicial findings[4] indicate GM's production process is by nature highly integrated. The court's sole concern, however, is whether GM's manufacture of finished automobiles qualifies as one continuous integrated production process for the purpose of exemption from sales/use tax. Both parties agree an integrated production process ends when a finished marketable product is produced. Nevertheless, the parties opposing contentions issue from differing definitions of the scope of an integrated production process. GM asserts its packing materials are exempt because they were used within one continuous integrated production process that ended upon the completion of finished marketable automobiles. On the contrary, the Department contends GM's packing materials are taxable because they were used after the end of one integrated production process, *i.e.*, the manufacture of marketable component parts, and before the beginning of another integrated production process, *i.e.*, the assembly of finished automobiles. The court must determine whether an integrated production process ends when a potentially marketable product first emerges (first finished marketable product) or whether it ends when the product is finished for actual sale in the marketplace (most marketable product) for purposes of the equipment exemption.

GM's component plants produce automobile parts; some become replacement parts diverted to the secondary market, some are sold to other automobile manufacturers, but most are integrated into GM's finished

---

**3.** The evidence shows GM's component plant personnel collaborate with the assembly plant personnel (1) to develop new product concepts, (2) to individually design, engineer, and test the performance of new parts and packing materials, (3) to plan the layout and production processes for new parts, (4) to coordinate production schedules because delays at one plant would have an immediate effect on the other plants, and (5) to solve problems and ensure quality control. Additionally, a continuity of production exists between GM's different plants demonstrated by the standard practice of shifting certain production operations back and forth between component and assembly plants when necessary for more efficient operation.

**4.** In *Aaron v. Review Board of the Indiana Employment Security Division* (1981), Ind.App., 416 N.E.2d 125, the court recognized GM's produc-

tion of fully assembled automobiles as an integrated production process when a strike at several GM plants was found to have a causal effect on layoffs at two other GM plants: "The strike had the expected effect of disrupting the company's automotive operations at all locations, which are admittedly highly integrated and interdependent." *Id.* at 129; *see also Baker v. General Motors Corp.* (1980), 409 Mich. 639, 659, 297 N.W.2d 387, 395 (GM foundries were functionally integrated with twenty-four other GM plants that were shut down because of strikes at the foundries); *General Motors Corp. v. California Unemployment Ins. Appeals Bd.* (1967), 253 Cal.App.2d 540, 547, 61 Cal.Rptr. 483, 488 ("highly integrated operations" of GM were entirely shut down by a strike at various GM plants).

automobiles.[5] The Department asserts GM's packing materials used to protect parts transported to GM's assembly plants are taxable, relying on this court's dicta in *Energy Supply, Inc. v. Indiana Department of State Revenue* (1990), Ind. Tax, 549 N.E.2d 1110:

> Accordingly, the court should examine the manufacturing process used by Energy to transform the raw coal into the finished product, marketable coal. Evidence has been presented that hauling the coal to the processing plant is necessary in order to obtain a marketable product.... *The court could find that the processing plant to which the trucks are driven is a part of Energy's integrated manufacturing process because ... the coal is not a finished product until it leaves the plant.* Based upon this analysis, the court could reasonably find that Energy's trucks are a part of an integrated process that does not end until after the coal leaves the processing plant.

*Id.* at 1114 (emphasis added). In *Energy Supply*, the intermediate stages of processing raw coal into marketable coal do not produce a finished marketable product. The Department suggests this absence of an intermediate finished marketable product supports its assertion that an integrated production process ends upon the completion of the first potentially marketable product. If the court were to adopt the Department's interpretation, determinations of when the first potentially marketable product emerged would be based on speculation and lead to arbitrary line drawing. Moreover, *Energy Supply* does not hold that the appearance of the first potentially marketable product terminates an integrated production process, and such a construction would be inconsistent with the controlling precedent of *Cave Stone*.

In *Cave Stone*, the supreme court focused on the overall manufacturing process required to produce finished marketable goods, citing favorably the rationale employed in the factually similar case *State Department of Revenue v. Calcar Quarries, Inc.* (1979), 182 Ind.App. 84, 394 N.E.2d 939: "We believe that the rationale of the First District in *Calcar* is correct. The exemption is provided for 'integral operations,' and the enumerated exemptions of the statute logically overlap." *Cave Stone*, 457 N.E.2d at 525. In *Calcar*, the court of appeals strictly construed the equipment exemption statute against the taxpayer, holding that equipment (1) used in an integrated operation (stone, concrete, and asphalt operations), (2) to transport *unfinished work in process* (stone), (3) from one production step to another (from quarry to stockpiles to crusher to a hot asphalt plant or a ready mix concrete facility) is exempt. *Calcar*, 182 Ind.App. at 90, 394 N.E.2d at 943. The court found Calcar's stone, transported at various stages in its processing, was *unfinished work in process* even though "not all the stone taken from the quarry was used for making concrete or asphalt [most marketable product]." *Id.* Indeed, the fact that quarry customers bought crushed stone (first marketable product), *Id.* at 86, 394 N.E.2d at 941, did not deter the court from finding the stone, concrete, and asphalt operations were integrated. *Id.* at 90, 394 N.E.2d at 943.

In *Cave Stone*, the supreme court found mining, crushing, and stockpiling stone were one continuous integrated production process rather than separate production processes because "unless the stone is transported from the quarry to the crusher and from the crusher to the stockpiles, no marketable product will result." *Cave Stone*, 457 N.E.2d at 524. *Cave Stone* does not express or imply, however, that the stone was a marketable product only after stockpiling. The trial court's findings indicate some customers purchased stone prior to stockpiling. *Id.* at 522 (finding of fact no. 15). Stockpiling merely put the

---

5. Completely different packing materials are used in connection with replacement parts than are used for component parts, reflecting their different end use. GM does not dispute the taxability of the packing materials used in connection with either replacement parts actually sold in the secondary market or component parts sold to other automobile manufacturers, nor are these materials at issue in this case.

stone in its *most marketable* form, not its *only* marketable form:

> The materials transported during the stock out step *had not yet been altered to their final, most marketable form*, which was accomplished through drainage in stockpiles. *Therefore, the stock out step also constituted transportation of unfinished work in process in a continuous flow from one production step to another in Cave's operations.*

*Id.* at 523 (finding of fact no. 17) (emphasis added).

In *Department of Revenue v. Kimball International, Inc.* (1988), Ind.App., 520 N.E.2d 454, Kimball manufactured finished wood products such as pianos, speaker cabinets, and furniture. The nature of these products indicates Kimball must also produce replacement parts to support its primary products; otherwise, customers would hesitate to purchase Kimball's products. As in *Calcar* and *Cave Stone*, the production of a potentially marketable product prior to the completion of the *most marketable product, i.e.,* pianos, speaker cabinets, and furniture, was irrelevant to determining that Kimball's operations were integrated processes qualifying for exemption. *Id.* at 457.

GM's component parts are *unfinished work in process* when actually used in GM's finished *most marketable product,* fully assembled automobiles. The end of an integrated production process is not signaled by the production of unfinished work in process merely because it is potentially a finished marketable product. An integrated production process terminates upon the production of the most marketable finished product, *e.g.,* the product actually marketed. Consequently, GM's manufacture of finished marketable automobiles is accomplished by one continuous integrated production process within which the transport of parts from component plants to assembly plants is an essential and integral part.

## LEGISLATIVE INTENT

■ The controversy's resolution, however, finally rests upon determining the legislature's intent underlying its grant of an equipment exemption from sales/use tax. The equipment exemption must be interpreted adhering to the rule that ambiguous exemption statutes must be strictly construed in favor of imposing tax and against the taxpayer. *See Dep't of Revenue v. United States Steel Corp.* (1981), Ind.App., 425 N.E.2d 659, 662. "The taxpayer claiming exemption has the burden of showing the terms of the exemption statute are met." *Caylor–Nickel Clinic, P.C. v. Indiana Dep't of State Revenue* (1991), Ind. Tax, 569 N.E.2d 765, 767 (citing *St. Mary's Medical Center v. State Bd. of Tax Comm'rs* (1989), Ind.Tax, 534 N.E.2d 277, 281 *aff'd,* (1991), Ind., 571 N.E.2d 1247). Exemption statutes are strictly construed because an exemption releases property from the obligation of bearing its fair share of the cost of government. *St. Mary's Medical Center,* 534 N.E.2d at 280. Nevertheless, a statute must not be construed so narrowly that it does not give effect to legislative intent because the intent of the legislature embodied in a statute constitutes the law. *See Johnson County Farm Bureau Coop. Ass'n v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 568 N.E.2d 578, 580 (citing *Wedmore v. State* (1954), 233 Ind. 545, 551, 122 N.E.2d 1, 4).

■ The legislative purposes of the manufacturer's exemptions are well recognized. The first is the "obvious legislative purpose to encourage industrial growth by allowing an exemption for items closely connected with the production of goods." *Indiana Dep't of State Revenue v. Indiana Harbor Belt R.R. Co.* (1984), Ind.App., 460 N.E.2d 170, 175 (quoting *United States Steel,* 425 N.E.2d at 664). An exemption for packing materials used to transport parts from component plants in Indiana to assembly plants outside Indiana is consistent with this legislative purpose. GM has six component plants at issue in this case and during the taxable years, had no assembly plants in Indiana. Therefore, Indiana has been the beneficiary of GM's decentralized integrated vertical manufacturing approach.

The second legislative purpose of the exemption statutes is to avoid tax pyramiding:

> 'All sales tax laws exempt or exclude some retail sales. The reasons for this treatment vary. Goods used in the manufacturing process are exempt entirely or partially by all state laws to avoid tax pyramiding, that is, the situation where a tax is levied on a tax and the result is a retail price increase greater than the amount of the tax.'

*Welsh v. Sells* (1963), 244 Ind. 423, 434–35, 192 N.E.2d 753, 759–60, 193 N.E.2d 359 (quoting Indiana Commission on State Tax and Financing Policy First Report, "Current Studies of Indiana Tax Policy, The Retail Sales Tax" at 11 (1962).

The imposition of sales/use tax on the packing materials at issue would result in tax pyramiding, the exact evil the legislature intended the exemption statutes to prevent. When equipment or materials used in the direct manufacturing process are taxed, the tax is generally passed on as part of the cost of the product being manufactured. To tax GM's packing materials would ultimately show up in the higher price of GM cars. In effect, therefore, the tax on the final product acts partly as a tax on tax.

The Department erroneously draws an artificial and arbitrary boundary based on the first marketable product to emerge rather than drawing the more logical line based on the actual end product produced. Under an approach focusing on the actual end product marketed, GM's packing materials used to transport component parts sold to non-GM manufacturers and those used to transport finished replacement parts would still be taxed. On the other hand, packing materials used to transport work in process parts from GM's component plants to GM's assembly plants would be exempt as an essential and integral part of GM's integrated production process of manufacturing finished automobiles. Finally, a determination that an integrated production process ends upon the completion of the actual end product marketed (the *most marketable product*) is wholly consistent with the legislative purposes of the exemption statutes to encourage industrial growth and to avoid tax pyramiding.

Accordingly, the court finds GM's packing materials, used in its integrated production process to protect unfinished work in process transported from one production step to another, exempt from sales/use tax under IC 6–2–1–39(b)(6) and IC 6–2.5–5–3.

## II. INTEREST

■ Following its audit of GM, the Department assessed and collected a use tax deficiency from GM plus interest assessed on the deficiency (deficiency interest). Before the trial of this case, the Department determined that the portion of the use tax and the deficiency interest involving the exemption of items of equipment other than packing materials was wrongfully assessed and should be refunded to GM. As a result, the Department refunded to GM the overpaid use tax and the deficiency interest attributable to the settled issues. The Department also paid GM interest on the use tax portion of GM's overpayment (refund interest) as expressly provided in IND.CODE 6–8.1–9–2(c) (1980). The Department, however, did not pay refund interest on the deficiency interest it wrongfully assessed and compelled GM to pay, notwithstanding the fact that the Department held and had use of GM's deficiency interest payment for several years.

### COMMON LAW RIGHT

In *Northern Indiana Public Service Co. v. Citizens Action Coalition of Indiana, Inc.* (1989), Ind., 548 N.E.2d 153 (*NIPSCO*), our supreme court recognized the common law right to receive interest as damages on money owed or withheld:

> It was recognized early on that interest should be allowed as damages for the withholding of another's funds regardless of whether the obligation arose from a contract or the wrongful acquisition or detention of another's money. [*McCormick on Damages*, § 51 at 210 (1935)]. This view found expression in the maxim 'interest goes with the principal, as the

fruit with the tree,' *Himely v. Rose,* 9 U.S. (5 Cranch) 312, 317, 3 L.Ed. 113 (1809), and was grounded in the theory that held money fails to yield a return only in the rarest of circumstances. Therefore, where an ascertainable amount was owed to another, denying interest on the sum amounted to a double wrong by depriving the person owed of the increase to which he was justly entitled and by allowing the one holding the funds to profit from the use of the funds that did not rightly belong to him. *Nashua & Lowell R Corp. v. Boston & Lowell R. Corp.,* 61 F. 237, 251 (1st Cir.1894). . . .

Indiana law reflects this view. *Id.* at 159. Consequently, GM has a common law right to receive interest as damages on money wrongfully collected and withheld.

## ABROGATION

The Indiana legislature has the power to abrogate or modify common law rights and remedies. *Dague v. Piper Aircraft Corp.* (1981), 275 Ind. 520, 529, 418 N.E.2d 207, 213. GM's entitlement to the refund interest on its excess payments of deficiency interest therefore depends on whether its common law right is abrogated by the legislation that empowers the Department. IC 6–8.1–9–2(c) (1980) (prior to amendment) was in effect when GM filed its claims for refund:

> [A]n excess tax payment that is not refunded or credited against a current or future tax liability within ninety (90) days after the date the tax payment was due, or was paid, whichever is later, accrues interest at a rate of twelve percent (12%) per year, or the adjusted rate established by the commissioner under IC 6–8.1–10–1(c), whichever rate is in effect from the date the tax payment was due or paid, whichever is later, until a date, determined by the department, that does not precede by more than thirty (30) days, the date on which the refund or credit is made.

"It is well settled that 'the legislature does not intend by a statute to make any change in the common law beyond what it declares either in *express terms* or by *unmistakable implication*.'" *NIPSCO,* 548

N.E.2d at 159 (quoting *Chicago and Erie R.R. Co. v. Luddington* (1910), 175 Ind. 35, 91 N.E. 939, *reh'g denied,* (1910), 175 Ind. 35, 42, 93 N.E. 273, 273 (emphasis added). IC 6–8.1–9–2(c) affirmatively designates only *excess tax payments* to accrue refund interest, but does not expressly prohibit the Department from paying refund interest on excess deficiency interest payments. Therefore, the statute's express terms do not abrogate the common law right recognized in *NIPSCO.*

IC 6–8.1–9–2(c) is silent regarding the accrual of refund interest on excess deficiency interest payments. The Department reads this silence in conjunction with the statute's express authorization to pay refund interest on excess *tax* payments as implying the legislature intended to confine refund interest payments exclusively to excess *tax* payments, thus limiting the common law right to receive interest on any money wrongfully withheld. The Department's interpretation is founded upon this court's decision in *Wechter v. Indiana Department of State Revenue* (1989), Ind. Tax, 544 N.E.2d 221, *aff'd,* (1990), Ind., 553 N.E.2d 844, that the express imposition of liability for unpaid taxes in IND.CODE 6–2.5–9–3 (1980) simultaneously prohibited the imposition of liability for unpaid interest and penalties, by implication, because neither interest nor penalties were mentioned in the statute. *Id.* at 224. If *Wechter* is controlling, IC 6–8.1–9–2(c) would prohibit the Department from paying refund interest on excess deficiency interest payments, by implication; nevertheless, an implication derived solely from legislative silence is not expandable to the *unmistakable implication* necessary to show the legislature intended the statute to change the common law. Consequently, the court finds IC 6–8.1–9–2(c) does not abrogate GM's common law right to receive interest as damages on money wrongfully collected and withheld either in express terms or by unmistakable implication.

## STATUTORY AUTHORITY

The Department contends IC 6–8.1–9–2(c) does not confer the statutory authority to

pay refund interest on excess deficiency interest payments nor does the Department have the discretion to enlarge or vary provisions established at law. Citing *Wechter* as controlling, the Department claims IC 6–8.1–9–2(c) can not be construed to implicitly grant the Department such authority. The construction of the statute at issue in *Wechter,* however, was not based solely on implications drawn from legislative silence, but was also based on other evidence, absent in the case at bar. IC 6–2.5–9–3 (1980) was subsequently amended to include the same language the court declined to read into the statute, raising a presumption the legislature intended to change the law. *Id.* at 223 (citing *Van Orman v. State* (1981), Ind.App., 416 N.E.2d 1301, 1305). Additionally, the court found the legislature intended to omit the interest and penalty language from IC 6–2.5–9–3 (1980) because the omitted language was expressly included in other contemporaneous statutes. *Id.*

Neither contemporaneous statutes nor subsequent amendments to IC 6–8.1–9–2(c) contain express language prohibiting the Department authority to pay refund interest on excess deficiency interest payments. Moreover, *Wechter* concerned rights and duties conferred by statute alone, while the case at bar concerns a common law entitlement independently authorizing the Department to pay refund interest on money wrongfully collected and withheld. *Wechter* is inapposite and therefore not controlling because it construes a different statute and does not involve a common law right. Accordingly, the court finds IC 6–8.1–9–2(c) does not prohibit, by implication, the payment of refund interest on excess deficiency interest payments.

It is unnecessary to determine whether IC 6–8.1–9–2(c) impliedly authorizes payment of the refund interest GM claims because Indiana adopted the rule recognized by the United States Supreme Court, which requires the Department, as an agency of the state, to pay interest on excess tax-related payments despite the absence of statutory authority:

> [I]n actions to recover back money unlawfully exacted in the name of the state by a public officer, of which the state has had the possession and use, and of the use of which the owner has been deprived since it was so paid under compulsion, a different rule has been applied. For many years, the Supreme Court of the United States has uniformly held that 'in suits against collectors to recover moneys illegally exacted as taxes and paid under protest … interest is recoverable without any statute to that effect, and this, although the judgment is not to be paid by the collector but directly from the treasury.' *Erskine v. VanArsdale* (1872), 15 Wall. (U.S.) 75, 77, 21 L.Ed. 63; *Redfield v. Bartels* (1891), 139 U.S. 694, 11 Sup.Ct. 683, 35 L.Ed. 310; *Nat'l Volunteer Home v. Parrish* (1913), 229 U.S. 494, 496, 33 Sup.Ct. 944 [945], 57 L.Ed. 1296; *Billings v. United States* (1914), 232 U.S. 261, 286, 34 Sup.Ct. 421 [426], 58 L.Ed. 596; *State Line & S.R. Co. v. Davis* (1915), 228 Fed. 246, 250; *Haiku Sugar Co. v. Johnstone* (1918), 249 Fed. 103, 109, 161 C.C.A. 155; *International Paper Co. v. Burrill* (1919), 260 Fed. 664, 667. The rule thus adopted is just and equitable and should be followed in the absence of any positive law to the contrary.

*Metropolitan Life Ins. Co. v. State* (1924), 194 Ind. 657, 665, 144 N.E. 420, 422.

In *State Department of Revenue v. American Motorists' Insurance Co.* (1979), 182 Ind.App. 645, 396 N.E.2d 907, the Department did not pay interest on the refund of motor fuel use taxes it erroneously assessed and collected, arguing the motor fuel use tax statutes were silent concerning the payment of interest on tax refunds; therefore, the necessary statutory authority was absent. The Indiana Court of Appeals, relying on *Metropolitan Life,* stated:

> The State correctly contends there is no specific statutory provision concerning payment of interest on refund of motor fuel use taxes. (footnote omitted) Further, it correctly states there is a split of authority in other jurisdictions as to whether a taxpayer is entitled to such interest in the absence of a specific statutory provision. *72 Am.Jur.2d, State and*

*Local Taxation,* § 1068 (1974). *See* 88 A.L.R.2d 823 (1963). Indiana is, however, a jurisdiction which does allow such interest even in the absence of specific statutory authority. *Metropolitan Life Ins. Co. v. State,* (1924), 194 Ind. 657, 144 N.E. 420 (Metropolitan paid taxes on certain gross receipts under protest when the State threatened both to revoke its license and to enforce a penalty of $100 per day for nonpayment.) *Board of Commissioners of Lake County v. Donch* (1893), 6 Ind.App. 337, 33 N.E. 663. (Donch paid taxes without protest and then sued for the refund.) *Id.* at 647–48, 396 N.E.2d at 908–09.

*Metropolitan Life* and *American Motorists'* are relevant because they stand, firmly grounded in the important policies of fairness and equity, for the proposition that the state owes interest on funds erroneously collected and later refunded. Identical policy concerns exist however the funds are expressed, whether as taxes, deficiency interest, or penalties. "What's in a name? That which we call a rose by any other name would smell as sweet." W. SHAKESPEARE, ROMEO AND JULIET, Act II, Scene 2.

A determination favoring the Department's position would countenance abject unfairness by permitting wrongfully compelled tax-related payments to be held for years interest free. The court therefore finds, regardless of the absence of specific statutory authority, that Indiana law requires the Department to pay refund interest on GM's overpayment of deficiency interest based on GM's common law right to receive interest as damages.

### SIMPLE INTEREST

Indiana law prescribes simple interest as the proper compensation for the loss of the use of one's money. *NIPSCO,* 548 N.E.2d at 161. The Department asserts IC 6–8.1–9–2(c) does not authorize the payment of refund interest on overpaid deficiency interest because interest paid on interest is compound interest. The Department, however, misunderstands the meaning of compound interest. GM asks for simple not compound interest. Compound interest (interest paid on interest) is interest paid by a *payor* on interest the *payor* previously paid or owed the *payee.* Simple interest, on the other hand, is simply interest paid or owed by the *payor* (the Department) on money previously paid by the *payee* (GM), whether the money represents tax, interest, penalties, or some other classification. Clearly, GM asks only for simple interest on the *total* money the Department wrongfully held.

The court, having found refund interest accrues on excess deficiency interest payments, also finds such refund interest is simple interest. The court further finds the Department is required to pay simple interest on the total amount (the overpaid tax and deficiency interest) refunded to GM.

### INTEREST RATE

Statutory authority does not exist providing an interest rate specifically applicable to tax-related refunds of excess deficiency interest payments. The court therefore must determine whether IND.CODE 24–4.6–1–103, the general interest statute, or whether IC 6–8.1–9–2(c) (1980), as GM asserts, provides the appropriate interest rate for such refunds.

In *NIPSCO,* 548 N.E.2d 153, the Indiana Supreme Court held, absent a specific statutory interest rate applicable to utility ratepayers' refunds, the appropriate rate for computing interest should provide "a reasonable gauge of a fair return on one's funds when held by another." *Id.* at 161. The court found the general interest statute provided a reasonable standard for a fair return on funds wrongfully withheld from ratepayers: "Interest at the rate of eight percent (8%) per annum [the general interest rate] shall be allowed ... for money had and received for use of another and retained without his consent." IC 24–4.6–1–103. The legislature, however, did not provide a more specific standard than the general interest statute to indicate a fair return on ratepayers' money wrongfully withheld by a utility.

In the tax context of the case at bar, the legislature did provide a more *reasonable gauge* than the general interest statute of a fair return on taxpayer's money wrongfully withheld by the Department:

> An excess tax payment that is not refunded or credited against a current or future tax liability within ninety (90) days after the date the tax payment was due, or was paid, whichever is later, accrues interest at a rate of twelve percent (12%) per year or the adjusted rate established by the commissioner under IC 6–8.1–10–1(c), whichever rate was in effect from the date the tax payment was due or paid, whichever is later, until a date, determined by the department, that does not precede by more than thirty (30) days, the date on which the refund or credit is made.

IC 6–8.1–9–2(c) (1980) (prior to the 1987 amendments). The statute expressly provides a standard rate of interest the Department must pay on refunds of *all* listed *tax* overpayments (tax refund interest rate), but is silent regarding whether it applies to other tax-related overpayments.

In *American Motorists'*, 182 Ind.App. 645, 396 N.E.2d 907, a case factually similar to the case at bar, the Indiana Court of Appeals declined the Department's invitation to determine that the legislature intended one uniform interest rate to apply to *all tax refunds*. *Id.* at 649, 396 N.E.2d at 909. The Motor Fuel Use Tax Statute did not provide a specific interest rate for tax refunds, however, the Department was statutorily required to pay six percent (6%) interest on gross income tax refunds [6] and adjusted gross income tax refunds,[7] and the Motor Fuel Use Tax Statute imposed a six percent (6%) interest rate on taxpayers' late tax payments.[8] Nevertheless, the court refused to consider what the legislature might have done had it included an interest rate provision for motor fuel tax refunds, and instead, upheld the use of the

eight percent (8%) general interest rate in the motor fuel tax refund context.

When *American Motorists'* was decided, however, the Tax Administration Act (the Act), IND.CODE 6–8.1–1–1 *et seq.* (1980) (effective January 1, 1981), had not been enacted. The legislature intended the Act to establish uniform procedural rules, including rules for the payment of interest, to simplify the Department's administration, assessment, and collection of the state's taxes. *See Evansville Concrete Supply Co. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 571 N.E.2d 1350, 1353. In the Act, IC 6–8.1–9–2(c) provides the interest rate for *all tax refunds*, and IND.CODE 6–8.1–10–1 imposes the identical interest rate on taxpayers' tax deficiencies or late payments. This uniform interest rate represents the legislature's *reasonable gauge* of a fair return on funds erroneously retained by either the taxpayer or the Department. Therefore, in the case at bar, the tax refund interest rate is logically applicable as a standard for calculating interest payable on tax related deficiency interest overpayments, corresponding with the legislature's intent to provide uniformity in the Department's administration of taxes.

The decision to apply the general interest rate in *NIPSCO* was made in the absence of a more relevant statutory rate and in *American Motorists'* was made without the Tax Administration Act's clear legislative intent to establish uniformity. The case at bar is distinguishable because refund interest began to accrue after the Act was enacted and a more relevant statutory rate than the general interest rate is applicable. *NIPSCO* and *American Motorists'* therefore do not direct the court to apply the general interest rate to refunded excess deficiency interest payments in the sales/use tax context. Neither is the court directed by express statutory language to apply the tax refund interest rate under IC 6–8.1–9–2(c). To determine which of two

---

**6.** IND.CODE 6–2–1–16(b) (prior to 1977 amendment).

**7.** IND.CODE 6–3–6–1(b) (prior to 1977 amendment). .

**8.** IND.CODE 6–6–2–9.

applicable statutes to apply, when the result of applying one would conflict with the results of applying the other, as a general rule, the court will apply the more detailed and specific statute instead of the more general statute. *State ex rel. Hatcher v. Lake Superior Court, Room Three* (1986), Ind., 500 N.E.2d 737, 739. The court therefore finds GM is entitled to refund interest on its refunded deficiency interest overpayment at the rate prescribed by IC 6-8.1-9-2(c).[9]

### PERIOD OF ACCRUAL

It is undisputed that the Department paid refund interest on GM's overpaid taxes involving the settled issues calculated from the date of payment to June 7, 1990, and that GM received the refund check on September 25, 1990. GM asserts, however, the Department must pay an additional amount of refund interest for the period between June 7, 1990 and August 26, 1990.

A taxpayer is entitled to interest on the refund of an excess tax payment "from the date the tax payment was due or paid, whichever is later, until a date, determined by the department, that does not precede by more than thirty (30) days, the date on which the refund or credit is made." IC 6-8.1-9-2(c) (1980). The date on which the refund was made to GM could be either the date the refund check was mailed or the date GM received the check. Notwithstanding, the Department did not present evidence concerning the date the refund check was mailed and did not address this issue in its briefs or argument. The court therefore finds the Department must pay GM additional refund interest on the refunded taxes involving the settled issues calculated from June 7, 1990, to August 26, 1990, thirty days prior to GM's receipt of its refund check on September 25, 1990.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be entered in favor of the Petitioner, General Motors Corporation. Accordingly, the Department is ORDERED to refund sales/use tax and interest GM paid on the packing materials at issue with refund interest on the entire amount at the rate and for the period prescribed by IC 6-8.1-9-2(c). Additionally, the Department is ORDERED to pay refund interest to GM on previously refunded deficiency interest, attributable to the settled issues referenced herein, at the rate and for the period prescribed by IC 6-8.1-9-2(c). Finally, the Department is ORDERED to pay refund interest to GM on the previously refunded tax overpayment attributable to the settled issues for the additional period determined in this opinion.

9. The use of the tax refund interest rate to compute the refund interest payable on excess deficiency interest payments is not foreign to the Department because undisputed evidence reveals the Department refunded excess tax and deficiency interest GM paid for the 1974 to 1978 taxable years, calculating the refund interest due on the *total amount* using the interest rates prescribed by IC 6-8.1-9-2(c).