ATTORNEYS FOR PETITIONER:
**RANDAL J. KALTENMARK**
**ZIAADDIN MOLLABASHY**
BARNES & THORNBURG LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**EVAN W. BARTEL**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

FILED

Jul 19 2017, 4:22 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| KLINK TRUCKING, INC., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 49T10-1307-TA-00064 |
| | ) |
| INDIANA DEPARTMENT OF STATE REVENUE, | ) |
| | ) |
| Respondent. | ) |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**July 19, 2017**

WENTWORTH, J.

Klink Trucking, Inc. appeals the Indiana Department of State Revenue's assessments of use tax for the 2008, 2009, and 2010 tax years (the "years at issue"). The Court restates the dispositive issue as whether Klink's trucks and related expense items were predominately used in providing public transportation during the years at issue and, thus, exempt from use tax. Upon review, the Court finds in favor of Klink.

## FACTS AND PROCEDURAL HISTORY

Klink, an Indiana corporation, is a motor carrier that provides landscaping,

construction, and hauling services from its landscaping yard in Fort Wayne, Indiana and from its two aggregate distribution centers in Ashley and South Bend, Indiana. (See Stipulation of Facts ("Stip.") ¶¶ 1, 25-27, Ex. 18-J at 3.) Klink's landscaping and construction divisions sell several industry-related products and provide a variety of other services, including road grinding, road sealing and surfacing, excavating, demolition, and pug-mill operations. (See Stip. ¶¶ 28-31.) The issues in this case do not involve the operations of the landscaping and construction divisions, but solely concern Klink's hauling business.

Klink's hauling division provides "straight and trailer dump operations, liquid and powder transportation, and equipment and commodity hauling" to its affiliates, governmental agencies, and other third parties. (See Stip. ¶¶ 26, 32-36, Ex. 22-J at 2-4.) Specifically, Klink used its fleet of over 80 trucks to haul an assortment of materials for third parties during the years at issue, including "stone, aggregates, agricultural lime and gypsum, cold-patch asphalt road mixes, landscaping materials, paving grade and emulsified liquid asphalt products, [and] road salt and de-icers[.]" (See Stip. ¶ 26, Ex.18-J at 53-55.) In addition, Klink used its trucks to haul its own property in instances when it purchased materials from pits, quarries, or other suppliers to resell them to its customers. (See Stip. ¶¶ 26, 38.)

During the years at issue, Klink used several standardized forms to record certain aspects of its hauling activities and to facilitate its billing process. (See, e.g., Trial Tr. at 100-03.) For instance, Klink provided "Klink Tickets" for its drivers to complete for each hauling trip. (See Trial Tr. at 103-05; Stip., Ex. 23-J, Tab 6 at 5.) Each Klink Ticket contained a unique, sequential pre-printed number, and when

complete, it identified 1) the date; 2) the purchaser's name and address; 3) the number of the truck that sold the materials; 4) the type and quantity of materials sold; and 5) the pit, quarry, or supplier from where the materials were originally picked-up. (See Trial Tr. at 103; Stip., Ex. 23-J, Tab 6 at 5.) Klink's drivers also completed or acquired three other forms:

1) "Trip Sheets" that summarized a truck's daily hauling activities by providing, among other things, a) the date; b) the truck's beginning and finishing mileage; c) the Klink Ticket numbers for each hauling trip; d) descriptions of the materials hauled; and e) the loading/unloading times for each hauling trip;

2) "Demurrage Sheets" that documented the "excessive" travel time for each hauling trip; and

3) "Pit Tickets" (a/k/a bills of lading) that were prepared by the pit, quarry, or supplier from which the materials were originally picked-up and stated, for example, the type and quantity of materials sold as well as the purchaser's name.

(See Trial Tr. at 102-10; Stip., Ex. 23-J, Tab 6 at 4, 6 and Tab 11 at 6.)

At the end of a shift, the drivers would place their completed Klink Tickets, Trip Sheets, Demurrage Sheets, and Pit Tickets into an envelope for Klink to use in its billing process. (See Trial Tr. at 101-03, 110.) Typically, the contents of the envelopes were sorted and coded on the following business day. (See, e.g., Trial Tr. at 110; Stip., Ex. 14-J, Tab Vol. 1 of 2 at 2-17.) At that time, each Klink Ticket was sorted by customer, product, and job; and it was given a product code to indicate whether Klink was hauling its own property or that of a third party. (See Trial Tr. 110-13 (explaining that a product code that ended in an asterisk or contained the words "haul only" in the description was used when Klink hauled another's property, not its own).) Then, Klink entered the newly coded information from the Klink Tickets, Trip Sheets, Demurrage Sheets, and Pit

3

Tickets into its computerized accounting system to prepare its monthly customer invoices and to reconcile its sales of materials and services. (See Trial Tr. at 110-11, 115, 121.)

Klink prepared separate invoices for its hauling charges and demurrage charges. (See, e.g., Trial Tr. at 115-16, 119.) Klink's hauling invoices always contained the lowest Klink Ticket numbers for a specific day, product, and job and identified the line item charges for single hauling trips or "batched" hauling trips (i.e., same day jobs involving the same customer, product, and product code). (See Trial Tr. at 115-16.) (See also, e.g., Stip., Ex. 23-J, Tab 6 at 1, 3, 5, 8.) Klink also generated monthly reconciliation reports that summarized its purchases from the pits, quarries, and suppliers to ensure that the bills it received from those entities corresponded with the charges on its customers' invoices. (See Trial Tr. at 114.)

In June of 2011, the Department notified Klink of its upcoming compliance audit. (See Stip. ¶ 5, Ex. 1-J.) During the audit, the Auditor applied an item-by-item methodology that examined the overall mileage of each truck to determine whether that individual truck was predominately used in providing public transportation during the years at issue. (See Trial Tr. at 90, Trial Ex. 6-P at 2; Stip., Ex. 5-J.) In so doing, the Auditor compared a sample of Klink's Trip Sheets[1] and Klink's self-prepared Income Analysis, which calculated the ratio of income Klink derived from hauling for third parties, to Klink's total hauling income for each of the years at issue. (See Stip. ¶ 14, Exs. 5-J, 8-J, 14-J; Trial Tr. at 99.) More specifically, the Auditor:

    1) calculated each truck's total mileage by subtracting the starting

---

[1] The sample of Trip Sheets appears to be derived from approximately 48 trucks for the 2008 tax year, 62 trucks for the 2009 tax year, and 74 trucks for the 2010 tax year. (See Stipulation of Facts, Ex. 10-J.)

and finishing mileage contained on the truck's first and last Trip Sheets for each quarter;

2) estimated the extent to which each hauling trip involved exempt mileage (i.e., the hauling of others' property) by first reviewing the following on the Trip Sheets: customer names, job descriptions (e.g., hourly work, contaminated waste, on site, salt, or "MSKD"), loading/unloading times, and handwritten Klink Ticket numbers, and then, cross-referencing that information by Klink's Income Analysis if the Trip Sheet information was ambiguous; and, then,

3) calculated each truck's non-exempt mileage (i.e., the hauling of Klink's property) by subtracting the Step 2 exempt mileage figure from the Step 1 total mileage figure.

(See, e.g., Trial Tr. at 36-40, 44-46, 52-69, 72, Ex. 18-J at 3-4, 53-55.) The Auditor allowed a 100% exemption when a truck's exempt mileage exceeded its non-exempt mileage. (See Trial Tr. at 72.) When Klink's related expense items could not be linked to a specific truck (e.g., fuel, repair parts, uniforms, or consumable office supplies), the Auditor allowed a partial exemption of 38%. (See Trial Tr. at 72-77; Stip., Ex. 18-J at 4.) (See also Stip., Ex. 18-J at 55 (indicating that the 38% allowance reflected the ratio of the entire fleets' overall exempt mileage of 1,153,688 and its total mileage of 3,069,209).) After accounting for the trucks that received full exemptions and the expense items that received partial exemptions, the Department issued Proposed Assessments of use tax in the amount of $449,733.09 on May 4, 2012. (See Stip. ¶¶ 22-24, Exs. 19-J to 21-J.)

On June 1, 2012, Klink filed a protest. (Stip. ¶ 19, Ex. 22-J.) On June 10, 2013, after conducting a hearing, the Department issued a Letter of Findings denying Klink's protest. (Stip. ¶ 21, Ex. 24-J.)

On July 25, 2013, Klink filed this original tax appeal. The Court conducted a trial

5

on February 25, 2016, and heard oral arguments on July 21, 2016.

## STANDARD OF REVIEW

The Court reviews final determinations of the Department de novo. IND. CODE § 6-8.1-5-1(i) (2017). Accordingly, the Court is not bound by the evidence or the issues presented at the administrative level. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

## LAW

During the years at issue, Indiana imposed an excise tax, known as the use tax, on "the storage, use, or consumption of tangible personal property in Indiana if the property was acquired in a retail transaction, regardless of the location of that transaction or the retail merchant making the transaction." IND. CODE § 6-2.5-3-2(a) (2008). Indiana's Legislature, however, specifically exempted from use tax those retail transactions where "the person acquiring the property or service directly use[d] or consume[d] it in providing public transportation for persons or property." See IND. CODE § 6-2.5-5-27 (2008) (amended 2013). See also IND. CODE § 6-2.5-3-4(a)(2) (2008). For purposes of this exemption, the Department has defined "public transportation" as "the movement, transportation, or carrying of persons and/or property for consideration by a common carrier, contract carrier, household goods carrier, carriers of exempt commodities, and other specialized carriers performing public transportation service for compensation[.]" 45 IND. ADMIN. CODE 2.2-5-61(b) (2008).

## ANALYSIS

There is no dispute that Klink used its property to provide exempt public transportation services when it hauled the property of others as well as taxable hauling

6

services when it used the same property to haul its own property. The sole issue is whether the Department erred when it used an item-by-item methodology to determine whether Klink predominately used its property in providing public transportation during the years at issue. Klink claims that the Department's use of an item-by-item methodology, or as here, a truck-by-truck methodology, is erroneous both by law and in reliability. (See Pet'r Post-Trial Br. ("Pet'r Br.") at 11-17, 25-28.)

**(1)**

Klink first contends that the Department did not properly determine the predominate use of its tangible personal property in providing public transportation because it used an item-by-item method of analysis that is not allowed by law. (See Pet'r Br. at 14-17; Oral Arg. Tr. at 8-9.) The Department counters, however, that this Court's prior decisions regarding the public transportation exemption required a "property- and use-centric approach" to determine predominate use. (See Resp't Post-Trial Br. ("Resp't Br.") at 8, 10-11.) The Department explains that it adopted its truck-by-truck methodology because "this Court focuses on the use of particular property in a transportation process." (See Resp't Br. at 8 (citing Wendt LLP v. Indiana Dep't of State Revenue, 977 N.E.2d 480, 488 (Ind. Tax Ct. 2012)).) Moreover, the Department further states that it is actually Klink's methodology of aggregating income that the Court rejected because it is "the taxpayer's use of its property, not the proportional sources of its income, [that] determine[s] whether a taxpayer could receive a public transportation exemption." (See Resp't Br. at 9 (citing Carnahan Grain, Inc. v. Indiana Dep't of State Revenue, 828 N.E.2d 465, 468-69 (Ind. Tax Ct. 2005)).)

The public transportation exemption statute does not require a specific method to

7

determine predominate use. See I.C. § 6-2.5-5-27. Indeed, there are many methods that can be used to show that a taxpayer's property was predominately used in an exempt manner. Wendt, 977 N.E.2d at 488. A review of all the persuasive methods in cases examining the public transportation exemption reveals that they share one common characteristic – each looks at the use of a taxpayer's property in the aggregate, not individually on an item-by-item basis. See, e.g., id. at 488-89, n.14 (ratio of exempt "jobs" to all "jobs"); Panhandle E. Pipeline Co. v. Indiana Dep't of State Revenue, 741 N.E.2d 816, 818 n.4 (Ind. Tax Ct. 2001) (total percentage of all freight publicly transported for third-parties), review denied; Indiana Waste Sys. of Ind., Inc. v. Indiana Dep't of State Revenue, 644 N.E.2d 960, 962 (Ind. Tax Ct. 1994) (ratio of exempt hauling income to total hauling income); Indiana Dep't of State Revenue v. Calcar Quarries, Inc., 394 N.E.2d 939, 941 (Ind. Ct. App. 1979) (aggregate rather than individual use of trucks). Moreover, the Court has not issued a blanket rejection of the use of all aggregate income methodologies in determining predominate use, as the Department has claimed. Rather, in Carnahan Grain the Court merely clarified that the scope of the public transportation exemption is limited to a taxpayer's transportation business and the methodology used to calculate predominate use must not include data from a taxpayer's unrelated lines of business. See Carnahan Grain, 828 N.E.2d at 468-69.

The Court finds both parties' methodologies permissible because the law does not require or prohibit the use of any specific methodology to show predominate use for purposes of the public transportation exemption. Accordingly, while Klink has shown that the Department's use of an item-by-item methodology is inconsistent with the more

8

common aggregate method for determining predominate use, it has not established that the Department's methodology was precluded by law.

**(2)**

Klink next contends that even if the Department's use of an item-by-item methodology is not prohibited, the methodology was unreliable because it failed to capture the full use of its property for public transportation purposes. (<u>See</u> Oral Arg. Tr. at 16, 25-27.) (<u>See</u> Pet'r Post-Trial Reply Br. at 6 (arguing that measuring predominate use by mileage alone does not capture a truck's use during traffic delays or loading/unloading times).) Klink explains that because the Department's analysis was based on Trip Sheets, which did not show the exempt mileage for each trip, the Auditor simply <u>estimated</u> exempt mileage based on the loading/unloading times contained on the Trip Sheets. (<u>See</u> Pet'r Br. at 23-24.) (<u>See also</u> Trial Tr. at 61-63, 106, 156.) Klink further states that although the Trip Sheets did not describe who owned the materials being hauled, the Auditor used them to <u>infer</u> ownership by comparing them, particularly the handwritten Klink Ticket numbers, to Klink's Income Analysis in cases of ambiguity. (<u>See</u> Pet'r Br. at 24.) (<u>See also</u> Trial Tr. at 65-66, 69-70 (indicating that the Auditor <u>assumed</u> mileage was not from exempt public transportation services when handwritten Klink Ticket numbers from the Trip Sheet did not correspond to numbers in Klink's Income Analysis).) Moreover, Klink maintains that the Department's calculations of mileage and ownership are not verifiable because the Auditor has admitted that he did not retain written records. (<u>See</u> Pet'r Br. at 24-25.) (<u>See also</u> Stip., Ex. 18-J at 53-55; Trial Tr. at 46, 58-59, 63, 66-68; Trial Ex. 1-P at 71.)

Without directly addressing these arguments, the Department contends that its

item-by-item methodology is more reliable than Klink's aggregate income methodology for two reasons. First, the Department claims that Klink "examine[d] the entirety of [its] income[] from multiple areas of its business" rather than limiting its calculations to its hauling income alone. (See Resp't Br. at 12-13.) To the contrary, however, the parties' factual stipulations and the trial evidence indicate that Klink did not use income derived from its landscaping and construction areas of business to determine predominate use. (See Stip. ¶ 14 (providing that Klink's Income Analysis "show[s] Klink's calculation of the ratio of its income from hauling for third parties to its total income from hauling").) (See also Trial Tr. at 145, 151-52 and Stip., Ex. 14-J, Tab Vol. 1 of 2 at 1 (demonstrating that Klink, in developing its predominate use ratios for each of the years at issue, specifically excluded income derived from its other lines of business).)

Second, the Department contends that Klink's methodology failed to reflect the actual use of Klink's trucks because "Klink charges different prices to haul different types of property the same distance[,]" and its methodology did not account for these "unit-based differences[.]" (See Resp't Br. at 13.) The Department explains that Klink's methodology "probably" distorted its public transportation activities "because a truck which spent the majority of its time on low-income, non-public transportation loads could be made to artificially appear as though it were predominately used in public transportation through a small number of high-income public transportation loads[.]" (See Resp't Br. at 13.) This contention, however, ignores that Klink's public transportation activities were not confined to hauling stone in dump trucks, but also included hauling contaminated waste, manure, road salt, liquids, and several other items in a variety of trucks. (See, e.g., Stip. ¶ 26, Exs. 18-J at 4, 22-J at 2.) Logic

10

dictates, therefore, that motor carriers like Klink would have different hauling charges based on the complexities and characteristics of their loads. Consequently, the Court does not find that Klink's inclusion of unit-based pricing within its aggregate income methodology distorts its public transportation activities because it reflects the breadth and diversity of Klink's public transportation services.

In contrast to the Department's item-by-item methodology that relies on estimates, inferences, and assumptions, Klink's aggregate income methodology used data exported from its computerized accounting system. (See Trial Tr. at 141-44, 147, 153-54; Stip., Ex. 14-J.) This data was routinely and contemporaneously entered into Klink's computerized accounting system during its billing process, incorporated Klink's distinct, uniformly-applied product codes, and was derived from several source documents (e.g., Klink Tickets, Trip Sheets, Demurrage Sheets, Pit Tickets) that reflected all aspects of Klink's provision of public transportation. (See Trial Tr. at 101-21, 141-55; Stip., Exs. 14-J, 23-J, Tab 6 at 4-6 and Tab 11 at 6.) Furthermore, Klink's financial statements and its monthly reconciliations of its customer invoices and sales corroborate the accuracy of Klink's conclusions derived from its aggregate income methodology.

The Court finds that the Department's reliance on unverifiable estimates, inferences, and assumptions in applying its item-by-item methodology detracts from its reliability. Furthermore, the Auditor's failure to review Klink Tickets, Demurrage Sheets, Pit Tickets, Invoices, and other hauling-related documentation also diminishes its reliability. (See Trial Tr. at 40-41, 89; Stip., Ex. 5-J (indicating that while Klink provided the Department with copies of its income statements, the Department found them to be

11

irrelevant).) Moreover, the fact that the Department was unaware of Klink's batching process (i.e., recording the lowest Klink Ticket number for all same day jobs involving the same customer, product, and product code) brings all the non-exempt mileage assumptions in the Department's item-by-item methodology into question. Consequently, the Court finds Klink's aggregate income methodology, which determined that it generated 60.2% of its income from providing public transportation in 2008, 58.9% in 2009, and 62.7% in 2010, more reliable than the Department's item-by-item methodology.[2] (See Trial Tr. at 112-114, 141-42; Stip., Ex. 14-J, Tab Vol. 1 of 2 at 1.)

## CONCLUSION

Klink has demonstrated that its trucks and related expense items were predominately used in providing public transportation during the years at issue and, therefore, exempt from use tax under the public transportation exemption. Consequently, the Court REVERSES the Department's final determination as to this issue and REMANDS the matter to the Department for action consistent with this opinion.

---

[2] The Court notes that Klink also claimed that the Department violated Indiana Code § 6-8.1-3-3(b) by retroactively applying a new interpretation of the public transportation exemption to Klink. (See, e.g., Pet'r Post-Trial Br. at 17-20.) The Court did not address this additional claim, however, because it found in favor of Klink on other grounds.

12